UNITED STATES of America, Appellee,

v.

Arthur BARRETT, Defendant-Appellant.

No. 75–1293.

United States Court of Appeals,
First Circuit.

Argued Jan. 7, 1976.

Decided June 22, 1976.

Martin G. Weinberg, Boston, Mass., with whom Oteri & Weinberg, Boston, Mass., Jeanne Baker and Rosenberg & Baker, Cambridge, Mass., were on brief, for defendant-appellant.

Michael A. Collora, Asst. U. S. Atty., Boston, Mass., with whom James N. Gabriel, U. S. Atty., and Richard E. Bachman, Asst. U. S. Atty., Chief, Crim. Div., Boston, Mass, were on brief for appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Arthur Barrett appeals from his conviction after a jury trial for crimes arising from the theft and sale of a collection of postage stamps from the Cardinal Spellman Philatelic Museum in Weston, Massachusetts. Barrett and seven others were charged in a three-count indictment with the interstate transportation of stolen postage stamps, in violation of 18 U.S.C. § 2314; the receipt,[1] concealment, sale, barter, and disposal of stolen postage stamps in violation of 18 U.S.C. § 2315; and conspiracy under 18 U.S.C. § 371. Of the eight indicted, Barrett alone went to trial.[2]

---

1. "Receipt" was stricken from the indictment by the court after the close of all the evidence.

2. Two of Barrett's codefendants pleaded guilty to one count of interstate transportation. Charges against the remaining five were dismissed.

The Government called as its first witness the manager of the Cardinal Spellman Museum who testified that on the morning of March 30, 1973, he arrived to find the Museum vault stripped and much of the stamp collection missing. There were virtually no clues. It was discovered that the burglars had bypassed the Museum's alarm system by attaching a jumper cable to the alarm wires at a juncture outside the Museum, thus neutralizing it. To do this, according to later expert testimony, the burglars would have had to measure the current in different wires in a sophisticated manner using a volt meter to assist in the process.

Three government witnesses implicated Barrett in the burglary and subsequent disposition of the stamps. The first was a Boston coin dealer named Kirzner, a codefendant who pled guilty to one count. Kirzner testified that on or about April 1, 1973, a reputed gangster named Ben Tilley had asked him to appraise some stamps. Tilley, who was deceased by the time of the trial, told Kirzner that he and his gang had stolen the Cardinal Spellman collection. He drove Kirzner to a house near Boston where Kirzner made an appraisal of stamps in albums and sheets marked with the name of Cardinal Spellman Museum. At the house, according to Kirzner, was the defendant Barrett, also known as "Bucky", whom Kirzner had met once previously. Kirzner testified that when he placed a value of only $10,000 on the United States portion of the collection, Barrett said, "if that is all that is worth that he [Barrett] would like to see it be returned to the museum", and "they should have been worth considerably more for the amount of time and effort that was required in securing [them]."

Kirzner made no arrangement to purchase the collection himself, but several days later telephoned Donald Townsend, the co-owner with David Griffiths of a coin and stamp business in Los Angeles,[3] and asked Townsend if he would be interested in buying a large stolen stamp collection worth $20,000 or $30,000. Townsend declined but passed the offer on to an acquaintance, Michael Bass, who expressed interest and came on to Boston.

Kirzner testified that he met Bass in Boston on April 11, 1973, and the two drove to a Holiday Inn in nearby Dedham, Massachusetts. There they rendezvoused with Ben Tilley and were taken to the same house Kirzner had visited earlier. Barrett, with others, was again present and participated in the conversations. After Bass finished looking over the stamps, Barrett drove them back to Kirzner's car. Kirzner concluded his testimony by describing Bass's agreement to buy part of the stamps for $10,000. Kirzner eventually received packets by mail from California that presumably held this sum, which he turned over to Tilley. Tilley paid Kirzner $1,000 for his services.

The Government then called Bass himself as a witness. He like Kirzner identified Barrett, or "Bucky", as being present at the house when Bass examined the stamps. While looking at the stamps on his first visit to the house, Bass recollected Barrett's commenting, " '[w]e know that this collection is worth $50,000 and we want you to make us an offer on it.' " Bass recounted other comments made by Barrett, including ones pointing out particular stamps as supposedly valuable. He testified that Barrett described his role in the burglary: "that he had climbed the telephone pole, bypassed the alarm system . . ., and that there was a tremendous amount of work blowing—getting this big vault door off—and they were running around like mad pulling collections down, and they figured that this was the biggest score of their lives."

After initially declining to buy the stamps, Bass later told Kirzner that he would purchase the United States portion of the collection for $10,000. Kirzner relayed this offer to Ben Tilley, who accepted it. According to Bass, Barrett drove him

---

**3.** Donald Townsend and David Griffiths were both charged as codefendants in the indictment. The charges were dismissed against them both prior to Barrett's trial and Townsend testified as a witness for the Government. He corroborated Kirzner's and Bass's testimony with respect to conversations to which he was a party.

back to the house two days later, where Bass picked out the stamps that he wanted. (All in all, Bass said he spent six to eight hours with Barrett while in Boston.) After the stamps were sent to Bass in Los Angeles, Bass gave Townsend and Griffiths a "finders fee" of $500 and some stamps to sell and sent Kirzner $10,000 in cash via registered mail.

Bass testified that he sold a portion of the stamps and stored the remainder, until the latter was seized by FBI agents in Los Angeles on May 22 and 23, 1973 (and thereafter identified by Museum personnel). Bass was also under investigation for other "fencing" activities, and agreed to cooperate with the Government in return for lenient treatment. When early in the investigation Bass was shown 20 or 25 photographs, he identified ones of Barrett, Kirzner and McAleney (a codefendant who pleaded guilty); however, he failed to recognize a photo of Ben Tilley, mistaking a picture of one William Creehan for that of Ben Tilley.[4] He also singled out photos of one James Tilley (apparently Ben's brother) and one Champa as portraying persons present during the Boston negotiations, but the Government later dropped charges against them both (and another government witness, "Buzzy" Adams, testified that Barrett told him Champa and possibly Creehan were not involved).

Adams, an admitted and convicted burglar and thief, testified for the Government in exchange for protection for himself and his family. He testified that he was introduced to Barrett by Ben Tilley in early 1972 for the purpose of discussing alarms, and that Barrett displayed knowledge of the use of an ohmmeter to identify alarm wires. Adams also testified that right after being arrested Barrett described his involvement, along with Kirzner, in the Cardinal Spellman stamp theft. He characterized Barrett as "a little familiar with stamps" and as having spoken of collections and stamps, specifically " 'Zeplins' " (which the Cardinal Spellman Collection included).

After the government rested, the defense unsuccessfully sought to introduce testimony from three witnesses under circumstances discussed below; otherwise it presented no testimony of consequence. The defense urged in closing argument that Barrett had been deliberately misidentified by Kirzner for ulterior purposes; that Bass's identification of Barrett was as unreliable as his identification of Tilley; and that "Buzzy" Adams was fingering "Bucky" Barrett to cover his own participation in the stamp theft.

I

Barrett challenges the admission into evidence of Buzzy Adams' testimony portraying Barrett as one knowledgeable in the workings of burglar alarms.[5] Adams related that, in the company of Ben Tilley, he talked to Barrett pertaining to a "score". He wanted to find out "if [Barrett] would be interested in taking a look at it and if he could find out if the alarm could possibly be bypassed."[6] Barrett told Adams that he didn't know and inquired about the type of alarm, "ADT or whatever". Adams went on to testify, "I said that I thought it might

4. Bass remembered Tilley as a meticulous dresser, but the photograph showed him poorly groomed, whereas that of Creehan was somewhat neater. Tilley's and Creehan's photos were put in evidence; both portray older men whose appearance is not markedly dissimilar. With respect to the Barrett identification, Bass claimed that Barrett's visage was "emblazoned" because of the time spent with him and because of a particular conversation they had. The coincidence of Kirzner's identification of Barrett and Bass's ability to select Barrett's unlabelled photograph from 20 to 25 others, might well have impressed the jury as strong confirmation of the Government's case.

5. We reject the Government's argument that by failing to state any grounds in the district court, Barrett forfeited his objection to the alarm testimony. The record indicates that the ground was, in the circumstances, "apparent from the context", Fed.R.Evid. 103(a)(1), and, in fact, understood by all the court itself referred to similar alarm evidence as evidence of prior bad acts.

6. Adams first testified that he was introduced to Barrett because he was looking for an "alarm man". That answer was stricken.

have been RIEP, . . . and I wasn't positive, and he said that he couldn't tell by just that, that he would have to go down and take a look at it and then he would have to take what you call a 'reading' with an ohmmeter on the telephone lines in order to determine what the voltage was and what you could do about it." Adams was permitted to testify that he had seen batteries and voltage equipment in Barrett's possession.[7] The court excluded other offered testimony that Adams actually saw Barrett "take a ohmmeter . . . and test the voltage on a particular alarm system and break it open and cut it out". The court characterized this as "so clearly evidence of another crime that . . . it would be asking for trouble."

Barrett argues that Adams' testimony concerning his knowledge of alarms was highly prejudicial and also irrelevant to the offenses charged, as he was charged only with transporting and selling the stolen stamps, not with burglary. Any possible materiality was overshadowed, he contends, by the evidence's capacity for prejudice.

■ It is true that unrelated criminal involvements may not be shown for the purpose of demonstrating that the accused had a "propensity to commit crime", *Fish v. United States*, 215 F. 544, 551 (1st Cir. 1914); *accord, Massei v. United States*, 241 F.2d 895, 902 (1st Cir. 1957), *aff'd*, 355 U.S. 595, 78 S.Ct. 495, 2 L.Ed.2d 517 (1958); Fed.R.Evid. 404(b). However, if such evidence is relevant to another, legitimate purpose it may be admitted if its probative value is not substantially outweighed by the danger of unfair prejudice, confusion of issues or misleading the jury, *see* Fed.R. Evid. 403; *United States v. Cepulonis*, 530 F.2d 238, 246 (1st Cir. 1976); *Dirring v. United States*, 328 F.2d 512 (1st Cir.), *cert. denied*, 377 U.S. 1003, 84 S.Ct. 1939, 12 L.Ed.2d 1052 (1964). Here, Barrett's expertise with alarms indicated that he had the skill to wire off the alarm system prior to

the break-in and accordingly helped identify him as one of the guilty parties. *See State v. Edelstein*, 146 Wash. 221, 262 P. 622, 628 (1927); Wigmore, Evidence §§ 87, 217 & 221 (3d ed. 1940). And identity was a main issue in his case. *See United States v. San Martin*, 505 F.2d 918 (5th Cir. 1974). Materiality to identity, as to guilty knowledge, intent or motive, is a reason often accepted for admitting evidence of this type. Fed.R.Evid. 404(b); *Green v. United States*, 176 F.2d 541, 543 (1st Cir. 1949); Wigmore, *supra*, § 217, at 718–19. One of the stamp burglars had to have sufficient knowledge of the intricacies of burglar alarm systems to locate the alarm wires, which were mingled with other wires inside a telephone cable, and to loop them off. The ordinary person or even burglar would be unlikely to possess the skill to do this. Where the bypassing of the alarm was so distinctive a feature of the stamp burglary, evidence that Barrett had expertise with alarms, while not by itself conclusive of guilt, reinforced the evidence that linked him to the burglary, and thereby to the crimes charged. Furthermore, we cannot say this testimony was merely cumulative and unnecessary. *Compare DeVore v. United States*, 368 F.2d 396 (9th Cir. 1966); *United States v. Byrd*, 352 F.2d 570 (2d Cir. 1965). It corroborated testimony of both Kirzner and Bass, whose credibility Barrett persistently attacked, and in addition added a new and fairly persuasive aspect to the Government's case. Barrett, it is true, was not charged with the break-in and theft. But there was a close relationship between the burglary and the later sale and transporting of the fruits of the theft; and when separate offenses form parts of a common scheme, one offense may be shown for its bearing upon the others. *United States v. Hopkinson*, 492 F.2d 1041 (1st Cir. 1974); *Green v. United States, supra*; *see* Fed.R. Evid. 404(b).

Nor was the probative value of the alarm evidence "substantially outweighed by the

---

7. The Government attempted to introduce evidence of one other conversation between Adams and Barrett, probably in August, 1974, concerning a "stamp score" where "they didn't get what they expected to". That testimony was not pursued, however, after the court indicated that Adams would have to identify the "score" as the Cardinal Spellman burglary.

danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Fed.R.Evid. 403; *United States v. Eatherton*, 519 F.2d 603, 611 (1st Cir. 1975) *cert. denied*, 423 U.S. 987, 96 S.Ct. 396, 46 L.Ed.2d 304, 44 U.S.L.W. 3305 (1975); *Green v. United States, supra*. The task of "balancing the prejudicial potential of the evidence against its probative value . . . is committed primarily to the trial court". *United States v. Eatherton, supra*. The court limited the evidence to that reasonably related to showing Barrett's expertise; it refused to admit evidence of specific criminal incidents which would be more prejudicial. Nor did this evidence receive disproportionate emphasis in the Government's total case. *See United States v. Clemons*, 503 F.2d 486, 491 (8th Cir. 1974); *Mills v. United States*, 367 F.2d 366 (10th Cir. 1966). Under the circumstances, we find no error in the court's balancing of the Government's right to introduce probative and competent evidence against defendant's right not to be placed unfairly in a bad light.

 Barrett further contends that proof that he committed the theft could not be introduced since neither the substantive offenses nor the overt acts in the conspiracy name him among the burglars, providing no notice that the Government would introduce evidence of his participation in the burglary. Barrett cites no cases to support this ingenious contention, and we know of none. Notice is constitutionally required to forewarn a defendant of acts for which he may ultimately be convicted and sentenced,[8] U.S.Const., amend. VI, but Barrett was not threatened with conviction for the theft. The evidence linking Barrett with the theft was no more required to be described in the indictment than any other piece of relevant, inculpatory evidence.

 Barrett further contends that, even if the evidence were properly admitted, no limiting instruction was given to restrict the way in which the jury should consider this evidence. *See* Fed.R.Evid. 105. Thus, he argues, the prejudice created by the admission of this evidence was further enhanced. However, after the court charged the jury he did not object to the omission of the single limiting instruction which he requested, nor ask for any others. He therefore waived any objection, *Carrillo v. Sameit Westbulk*, 514 F.2d 1214, 1218–19 (1st Cir. 1975); *United States v. Taglianetti*, 456 F.2d 1055 (1st Cir. 1972); Fed.R.Crim.P. 30, and, taking into account the court's instructions as a whole, we do not find plain error in the omission. *See* Fed.R.Crim.P. 52(b).

## II

Barrett next argues that the court below erred by refusing to admit the testimony of three defense witnesses. The first was James Melvin. Melvin testified that in February, 1974, he was at a card game on Bowdoin Street, in Dorchester, Massachusetts, with Ben Tilley. When Melvin was asked to recount a conversation which he had there with Tilley, the Government objected. Barrett made an offer of proof that Melvin would testify that Tilley had told Melvin "that he, Tilley, and Buzzy [Adams] were going to have some trouble from the people from California" with respect to the "stamp theft or matter" and that "[Melvin] asked him did he mean Bucky or Buzzy, and then he said, 'No, Bucky [Barrett] wasn't involved. It was Buzzy.'" Barrett argued at the bench that this testimony was admissible under *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), and Fed.R.Evid. 804(b)(3) as a declaration against self-interest, apparently on the theory that Tilley's display of inside knowledge of "the people from California" (presumably Bass and his associates), the stamp theft, and the identity of persons "involved", all tended against Tilley's penal interest at the time by advertising his likely

---

**8.** Overt acts are evidence of a conspiracy, not a necessary element of the offense (so long as at least one is proven). *See Yates v. United States*, 354 U.S. 298, 334, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957). The failure to name Barrett as participating in the first overt act alleged, the burglary, was not fatal as would be a failure to charge an essential element of the crime.

complicity. The court excluded the proffered testimony as hearsay on the ground that the relevant part, that Buzzy, not Bucky, was involved, was not against Tilley's interest. The court said, "You are offering it not to prove anything prejudicial to the alleged maker of the statement but to prove that [Buzzy] rather than [Bucky] did it . . . ." Barrett argues on appeal that the entire statement, including the portion exculpating Barrett, should have been admitted.

Rule 804(b)(3) of the new Federal Rules of Evidence provides, with an important qualification, for the admission of a statement by an unavailable declarant that at the time of making tended to subject him to criminal liability. The rule provides in pertinent part,

"(b) *Hearsay exceptions.* The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

\* \* \* \* \* \*

(3) *Statement against interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissable [sic] unless corroborating circumstances clearly indicate the trustworthiness of the statement."

Rule 804(b)(3) is a departure from the principle laid down in *Donnelly v. United States*, 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820 (1913), in which the Supreme Court endorsed the exclusion from evidence of a third party's extra-judicial confession to the murder for which the defendant was on trial. In conformity with English precedent, the *Donnelly* court limited the hearsay exception for declarations against interest to declarations against interest of a pecuniary character. *Id.* at 272–77, 33 S.Ct. 449. Statements subjecting the declarant

to criminal liability were held to be outside the exception.

Half a century later, when the present Federal Rules of Evidence were being formulated, *Donnelly* was in disfavor, and provision was made in the various drafts of the new code for the admission of declarations against penal interest. *See M.S. Walker, Inc. v. Travelers Indemnity Co.*, 470 F.2d 951 (1st Cir. 1973). The text underwent several revisions prior to enactment. A provision forbidding prosecutorial use of third party statements or confessions which implicated an accused as well as the declarant was deleted, with the result that subject to sixth amendment and other constraints, a third party's out of court statements against penal interest may now be used against, as well as in favor of, an accused. And, more relevant here, the second sentence of clause (3) was rewritten to require that statements offered to exculpate the accused be corroborated so as to "clearly indicate the trustworthiness of the statement".

As submitted to Congress by the Supreme Court, the Rule required simply that a statement offered to exculpate the accused be corroborated. 56 F.R.D. 183, 321 (Rule 804(b)(4)). The Advisory Committee explained this requirement as a way of accommodating the common law's distrust of confessions offered to exculpate an accused:

"The refusal of the common law to concede the adequacy of a penal interest was no doubt indefensible in logic [citing Holmes' *Donnelly* dissent], but one senses in the decisions a distrust of evidence of confessions by third persons offered to exculpate the accused arising from suspicions of fabrication either of the fact of the making of the confession or in its contents, enhanced in either instance by the required unavailability of the declarant. Nevertheless, an increasing amount of decisional law recognizes exposure to punishment for crime as a sufficient stake. The requirement of corroboration is included in the rule in order to effect an accommodation between these compet-

ing considerations. When the statement is offered by the accused by way of exculpation, the resulting situation is not adapted to control by rulings as to the weight of the evidence, and hence the provision is cast in terms of a requirement preliminary to admissibility. The requirement of corroboration should be construed in such a manner as to effectuate its purpose of circumventing fabrication." [Citations omitted.]

Notes of Advisory Committee on Proposed Rules, at 28 U.S.C.A. Fed.R.Evid. 804.

The House Judiciary Committee strengthened this corroboration requirement by adding the present language. The Committee noted,

"[The Committee] believed . . . as did the [Supreme] Court [in its earlier version] that statements of this type tending to exculpate the accused are more suspect and so should have their admissibility conditioned upon some further provision insuring trustworthiness. The proposal in the Court Rule to add a requirement of simple corroboration was, however, deemed ineffective to accomplish this purpose since the accused's own testimony might suffice while not necessarily increasing the reliability of the hearsay statement. The Committee settled upon the language 'unless corroborating circumstances clearly indicate the trustworthiness of the statement' as affording a proper standard and degree of discretion. It was contemplated that the result in such cases as *Donnelly v. United States*, 228 U.S. 243 [33 S.Ct. 449, 57 L.Ed. 820] (1912), where the circumstances plainly indicated reliability, would be changed."

Notes of Committee on the Judiciary, H.R. Rep.No.93–650, Note to Subdivision (b)(3), at 28 U.S.C.A. Fed.R.Evid. 804, U.S.Code Cong. & Admin.News 1974, pp. 7051, 7089.

■ As finally enacted, Rule 804(b)(3) requires a two-stage analysis: first, do the offered remarks come within the hearsay exception as a "statement against interest"? and second, if they do, is there sufficient corroboration to clearly indicate trust-worthiness? Here we believe that the remarks offered were statements against interest within the Rule, and that the district court should have gone on to determine whether there was sufficient corroboration so as to warrant their admission.

■ Turning to the first stage of analysis, we think that Tilley's alleged remarks sufficiently tended to subject him to criminal liability "that a reasonable man in his position would not have made the statement unless he believed it to be true." Although the remarks did not amount to a clear confession to a crime as did the declarations in cases like *Donnelly* and *Chambers v. Mississippi, supra*, we do not understand the hearsay exception to be limited to direct confessions. *See* Note, *Declarations Against Penal Interest: Standards of Admissibility Under an Emerging Majority Rule*, 57 Bost.U.L.Rev. 148, 158 (1976). A reasonable person would have realized that remarks of the sort attributed to Tilley strongly implied his personal participation in the stamp crimes and hence would tend to subject him to criminal liability. Though by no means conclusive, the statement would be important evidence against Tilley were he himself on trial for the stamp crimes. We cannot say, therefore, that it did not pose the sort of threat to Tilley's interest that the hearsay exception contemplates. *See id.* at 156–58.

We do not overlook the fact that the proffered remarks came in the course of conversation with acquaintances over cards. In such circumstances, Tilley might not so readily have perceived the disserving character of what was said nor have expected his words to be repeated to the police. *See id.* at 159–65 and cases cited therein. But we are unable to say that the contextual circumstances so far impugn the reliability presumed from the remarks' disserving character as to take them outside the first part of the Rule. *See Chambers, supra*, 410 U.S. at 300, 93 S.Ct. 1038 (confession made "spontaneously to a close acquaintance"); *cf. McClain v. Anderson Free Press*, 232 S.C. 448, 467, 102 S.E.2d 750, 760 (1958) (Oxner, J., concurring), *cited in* Note, *Dec-*

*larations Against Penal Interest, supra*, at 159. The factors in question seem better considered under the second part of the Rule in determining whether, overall, there is enough corroboration to "clearly indicate . . . trustworthiness".

Nor do we overlook the fact that exculpating Barrett was not in itself against Tilley's interest, since both could have participated in the crime. Tilley's remarks differ in this respect from the third-party confessions in *Chambers* and *Donnelly*. In Barrett's trial, the relevance of Tilley's participation is limited to the credence it gives to his views on who else took part. The district court seemed to suggest that in order for exculpatory remarks such as Tilley's to be admissible as against interest, the innocence of the accused must itself be prejudicial to the declarant. On the present facts, we read the first part of Rule 804(b)(3) more broadly, and conclude that so much of Tilley's remarks as exculpated "Bucky" and inculpated "Buzzy" should here be considered as part of the statement against Tilley's interest.

Under the common law exception for declarations against interest, the treatment to be given portions of a declaration collateral to the declarant's interest has been the subject of much debate. A leading commentator, after acknowledging the traditional liberality with which courts have admitted collateral statements, has expressed the opinion that,

"As long as the courts adhere to the exceptions to the hearsay rule it would be more reasonable to confine the use of statements against interest in all cases to the proof of the fact which is against interest, since the reliability of other parts of the statement is conjectural."

B. Jefferson, *Declarations Against Interest: An Exception to the Hearsay Rule*, 58 Harv.L.Rev. 1, 62–63 (1944). And more pointedly, in an article criticizing certain conventional exceptions to the hearsay rule, another author has said,

"Nonetheless, the naming of another as a compatriot will almost never be against the declarant's own interest and thus will contain little assurance of reliability on this ground. . . . The invocation of a name may be gratuitous, may be deliberately false in order to gain advantages for the declarant greater than those that would flow from naming a real participant or no one at all, may be a cover for concealment purposes (another kind of 'advantage'), or may represent an effort to gain some kind of personal revenge." [Footnote omitted.]

D. Davenport, *The Confrontation Clause and the Coconspirator Exception in Criminal Prosecutions: A Functional Analysis*, 85 Harv.L.Rev. 1378, 1396 (1972).

There are two reasons, however, which make it difficult for us to agree with the district court's view of the statement in issue. First, the Buzzy-Bucky statement, especially in context, is itself arguably disserving to Tilley, since it strengthened the impression that he had an insider's knowledge of the crimes. And second, the case law, while far from settled, has tended to grant at least "[a] certain latitude as to contextual statements, neutral as to interest giving meaning to the declaration against interest . . .", McCormick on Evidence § 279(a), at 676 (2d ed. 1972); *see United States v. Goodlow*, 500 F.2d 954 (8th Cir. 1974); *cf. United States v. Seyfried*, 435 F.2d 696 (7th Cir. 1970), *cert. denied*, 402 U.S. 912, 91 S.Ct. 1393, 28 L.Ed.2d 654 (1971). *See also* cases cited in Wigmore *supra*, § 1465. *But see United States v. Marquez*, 462 F.2d 893, 895 (2d Cir. 1972). While we do not read the federal rule as incorporating the rather broad formulation put forward by Wigmore, who saw the against-interest exception as permitting reception not only of the "specific fact against interest, but also . . . *every fact contained in the same statement*", Wigmore, *supra*, § 1465, at 339 (emphasis in original), neither does it appear that Congress intended to constrict the scope of a declaration against interest to the point of excluding "collateral" material that, as here, actually tended to fortify the statement's disserving aspects. *See* Notes of Advisory Committee, *supra*; Notes of Com-

mittee on the Judiciary, *supra*. We hold that the Buzzy-Bucky remark was sufficiently integral to the entire statement, and the latter sufficiently against interest, as to come within the first part of Rule 804(b)(3).

It follows that the district court was under an obligation to determine, under the second sentence of the Rule, whether "corroborating circumstances clearly indicate[d] the trustworthiness of the statement", including, we would add, the trustworthiness of that part exculpating Barrett. We emphasize that admissibility is conditional upon separate compliance with that standard, which, it is clear from both the statutory language and the legislative history, is not an insignificant hurdle. However, because the court below believed that the Buzzy-Bucky remark was inadmissible because outside Tilley's statement against interest, it never expressly analyzed the proposed testimony in light of that standard. And because for other reasons, *see infra*, there must be a new trial, we ourselves take no position at this time on the admissibility of the testimony under this standard. Unlike the first part of the Rule, which must be read in light of the case law that has evolved under the common law hearsay exception, the second part breaks · new ground. We read the Rule as investing the district court with a substantial degree of discretion in making this important finding on trustworthiness, and therefore prefer to let the district court rule first in the course of the new proceeding. We would, nonetheless, make two observations to guide the district court's judgment, should the question arise upon retrial.

First we would not read the standard of trustworthiness as imposing a standard so strict as to be utterly unrealistic. Even in *Donnelly* and *Chambers* the evidence, while strongly corroborated, could have been disbelieved by the jury. On the other hand, there is no question but that Congress meant to preclude reception of exculpatory hearsay statements against penal interest unless accompanied by circumstances solidly indicating trustworthiness. This requirement goes beyond minimal corroboration. Trial judges will have to make an assessment case by case and in attempting to understand the standard may be aided by the legislative comments quoted above. In cases that are open to reasonable differences, this court is unlikely to substitute its judgment for that of the district court.

Second, in ruling on trustworthiness courts should be mindful of the possible relationship between constitutional cases such as *Chambers* and the new federal rule. *Chambers* holds, on facts far more compelling than anything here, that it is a violation of due process to exclude such exculpatory evidence as a well established confession of another to the crime for which the accused is on trial. Rule 804(b)(3) reflects Congress' attempt to strike a fair balance between exclusion of trustworthy evidence, as in *Chambers* and *Donnelly,* and indiscriminate admission of less trustworthy evidence which, because of the lack of opportunity for cross-examination and the absence of the declarant, is open to easy fabrication. Clearly the federal rule is no more restrictive than the Constitution permits, and may in some situations be more inclusive. We do not suggest that there is any issue of constitutional dimension in the present case.

### III

We turn next to the court's exclusion of the testimony of the defense's two remaining witnesses, Thomas J. Delaney and Jeanne Kelley. We hold such exclusion to have been error.

Delaney stated that he met with Buzzy Adams in or around November, 1974, in a Boston area restaurant. He was then asked to relate their conversation. The Government objected and Barrett offered to prove that "Adams said that he had heard that Barrett had been indicted, or had gotten into trouble on this matter, and that it was too bad because he, Buzzy, knew that Barrett was not involved." Kelley, a waitress, was prepared to testify that, while waiting on Adams and Delaney at the same restaurant, she overheard Adams say "it was a shame that Bucky got arrested on this mat-

ter" because he (Adams) "knew that Bucky didn't have anything to do with it."

Conceding that this evidence was hearsay, Fed.R.Evid. 801(d)(1), and so inadmissible to prove the truth of the matter asserted, Barrett argues that it was admissible as a prior inconsistent statement to impeach Adams' credibility. Adams had earlier testified that Barrett admitted to him shortly after his arrest that he had been involved in the stamp transaction.[9] Barrett contends that Adams' subsequent statement to Delaney in November, 1974, that Barrett was not involved, was contradictory and so admissible to impeach his credibility.

■ We believe the court erred in excluding this testimony. Counsel for Barrett advised the court, albeit rather succinctly, that the testimony went to the credibility of Adams who had testified. The court ruled it out on the ground that it was a "hearsay opinion by Mr. Adams, that this guy is innocent. That is all this amounts to." The Government now argues, in the same vein, that Adams' purported opinion was too vague and unsupported to be useful. However, the clear purport of Adams' direct testimony was that in late October, 1974, after Barrett's arrest, Adams acquired first-hand knowledge of Barrett's involvement in the stamp affair, and the jury could have inferred from this and other testimony that at all times thereafter Adams remained of the impression that Barrett was involved. The statement to Delaney, therefore, made supposedly in November, 1974, was clearly inconsistent. To be received as a prior inconsistent statement, the contradiction need not be "in plain terms. It is enough if the proffered testimony, taken as a whole, either by what it says or by what it omits to say, affords

some indication that the fact was different from the testimony of the witness whom it is sought to contradict." *Commonwealth v. West,* 312 Mass. 438, 440, 45 N.E.2d 260, 262 (1942), *cited in* McCormick, *supra,* § 34, at 68 n. 15. Furthermore, the fact that Adams' belief that Bucky was not involved might be called an "opinion" is immaterial. *Id.* § 35; *see Ewing v. United States,* 77 U.S.App.D.C. 14, 135 F.2d 633, 642 (1942), *cert. denied,* 318 U.S. 776, 63 S.Ct. 829, 87 L.Ed. 1145 (1943). The important point is the clear incompatibility between Adams' direct testimony and the alleged statement.

■ The Government also urges that Delaney's memory of the timing of the statement was uncertain, as well as his memory as to other details. And it may well be that Delaney's testimony would have turned out to be inadequate and thin in various respects. But this possibility is not a ground for keeping the evidence from the jury, which is the principal judge of the credibility of witnesses and the weight to be given to otherwise competent testimony.

■ A more serious argument pressed by the Government is that Barrett failed during cross-examination to lay a foundation for introducing extrinsic evidence of the statement by first directing Adams' attention to the occasion of the alleged contradictory statement and asking him if he made it. Such is the procedure laid down in *Queen Caroline's Case,* 2 Brod. & Bing. 284, 313, 129 Eng.Rep. 976 (1820), and required in many jurisdictions (though not in Massachusetts). It is clear, however, that Fed.R. Evid. 613(b) has relaxed any absolute requirement that this practice be observed, only requiring instead that the witness be afforded at some time an opportunity to explain or deny, and for further interroga-

---

9. Barrett was arrested and bailed in late October, 1974. According to Adams they had a conversation a day or so later in which,

"A. I asked him what was the story and how did they come down to his house and arrest him.

He said that he didn't know too much about it. I said, 'How bad is it, how bad have they got you'?

He said, 'Well, they got me. I bartered with the people that bought the stuff. They can identify me with no problem.'

He said that he was worried about this other fellow, the dealer, Michael Kirzner.

Q. He said he was worried about Mike Kirzner?

A. Right.

Q. What was he worried about him?

A. Because that is who he dealt with, and the other guys."

tion.[10] The purpose of the wording of the new rule is fully explained by the Reporter of the Committee on Rules of Practice and Procedure, of the Judicial Conference of the United States, and we reproduce his relevant commentary in full:

"The traditional practice in most jurisdictions, when it is sought to impeach a witness by proof of a prior inconsistent statement, has been to require that a foundation be laid during the cross-examination of the witness. This foundation consists of directing the attention of the witness to the time when, place where, and person to whom the alleged statement was made, and asking the witness whether under those circumstances he made substantially that statement. In the absence of this preliminary routine, extrinsic evidence to prove the prior statement is held inadmissible.

The objectives of the procedure are: (1) to save time, since the witness may admit having made the statement and thus make the extrinsic proof unnecessary; (2) to avoid unfair surprise to the opposite party by affording him an opportunity to draw a denial or explanation from the witness; and (3) to give the witness himself, in fairness, a chance to deny or to explain the apparent discrepancy. These are desirable objectives. The second and third can, however, be achieved by affording an opportunity to explain at any time during the trial, and no particular time sequence is required. Only the first of the objectives named above, saving time, points in the direction of the traditional foundation requirement on cross-examination, and even here countervailing factors are present: the time saved is not great; the laying of the foundation may inadvertently have been overlooked; the impeaching statement may not have been discovered until later; and premature disclosure may on occasion frustrate the effective impeachment of collusive witnesses. The argument may be made that the recalling of a witness for further cross-examination will afford an adequate solution for these difficulties and hence that the traditional procedure should be retained. The argument is not a sound one. In the first place, recall for cross-examination has traditionally been very much within the discretion of the judge and seems likely to continue so. And secondly, the admissibility of prior inconsistent statements ought not to be enmeshed in the technicalities of cross-examination when all that is being sought is the presentation of an opportunity to deny or explain.

In view of these considerations, the Advisory Committee concluded that the objectives could better be achieved by allowing the opportunity to deny or explain to occur at any time during the trial, rather than limiting it to cross-examination.

Moreover, occasionally situations may arise where the interests of justice will warrant dispensing entirely with the opportunity to explain or deny. Thus if a witness becomes unavailable through absence or death, the judge ought to have discretion to allow the impeaching statement.

In my view, the existing practice would continue in general to be followed under the rule. It is convenient and effective to raise the matter on cross-examination, and doing so would avoid problems that might ultimately arise if witnesses become unavailable before the end of the trial. The rule ought, however, to remain as drawn, leaving the practical approach to the good sense of the practitioner."

*Hearings before the Subcomm. on Criminal Justice on Proposed Rules of Evidence,* 93d Cong., 1st Sess., ser. 2, at 74–75 (Supp.1973).

■ The foregoing indicates that while good practice still calls for the laying of a

---

**10.** Clause (b) of Fed.R.Evid. 613 provides, in part,

"Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require."

foundation, one is not absolutely required. It would have been desirable for defense counsel to have asked Adams on cross-examination if he had made the purported statement to Delaney. And where this was not done, if Adams had later become unavailable to explain or deny, the court might properly in its discretion have refused to receive the testimony in question. Here, however, the court dismissed the evidence out of hand and made no inquiry into Adams' availability. On the present record, we have no basis for assuming that he was not available, or even that judicial economy and convenience would have justified the court in ruling as it did. We hold, therefore, that it was error to exclude the testimony.

A final question is whether the error was one which affected "substantial rights", requiring reversal. Fed.R.Crim.P. 52(a). *See Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); 3 C. Wright, Federal Practice and Procedure § 852. The case against Barrett was strong, and we are tempted to say that the proffered testimony was unlikely to have affected the result. Barrett's defense rested, however, on the notion that Kirzner and Bass were lying in hope of reward and Adams was lying because he, not Bucky, was the real culprit. We cannot say, given Adams' criminal background, that if Delaney and Kelley had impressed the jury, the credibility of Adams would not have been substantially diminished, and, with this tangible achievement, the defense would not have achieved its goal of raising a reasonable doubt in the minds of the jury. This is not a result we would either look for or, on this record, applaud, but we cannot with certainty say that the error was harmless.

As for Barrett's other arguments on appeal, we have considered them and find them to be without merit.

*Vacated and remanded.*