Kevin ROBINSON, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 507, 2009.

Supreme Court of Delaware.

Submitted: June 16, 2010.
Decided: Aug. 16, 2010.

Michael C. Heyden, Esquire, Wilmington, Delaware, for appellant.

Timothy J. Donovan, Jr., Esquire, Department of Justice, Wilmington, Delaware, for appellee.

Before HOLLAND, BERGER and RIDGELY, Justices.

HOLLAND, Justice:

This is a direct appeal by the defendant-appellant, Kevin J. Robinson ("Robinson"). Following a jury trial in the Superior Court, Robinson was found guilty of Murder in the First Degree, Possession of a Firearm During the Commission of a Felony and Robbery in the First Degree. Robinson was sentenced to life in prison for the Murder in the First Degree conviction, nine years in prison for Possession of a Firearm During the Commission of a Felony and eight years in prison for Robbery in the First Degree.

Robinson has raised two issues on appeal. First, he argues that his constitutional rights were violated by the State's failure to provide the defense with exculpatory evidence in violation of its obligations under *Brady v. Maryland.*[1] Second, Robinson contends that his constitutional rights were violated when the trial judge limited the cross-examination of a State's witness concerning prior inconsistent statements made by a different witness for the State. We have concluded that both of Robinson's arguments are without merit. Therefore, the judgments of the Superior Court must be affirmed.

### Facts [2]

On the afternoon of July 22, 2006, Robinson and co-defendant Timothy Austin ("Austin") drove from Philadelphia to Claymont to meet with the victim Kevin Rafferty ("Rafferty") in the parking lot of the Brookview Apartments. Austin and Rafferty were acquaintances. They had previously arranged the meeting by telephone. Austin was to buy two ounces of marijuana from Rafferty for $500.

Accompanying Rafferty to the rendezvous was Rafferty's friend, William Witts ("Witts"). Rafferty was a self-employed electrician, and Witts worked for him as an assistant. The two lived together in Leedom Estates.

At trial, Witts testified that Rafferty regularly sold marijuana to supplement his income. On the day of the murder, Rafferty woke Witts up at about noon and told him they were going to a party, but first had to make a stop in Claymont. The two then drove to Claymont and parked in the parking lot of the Brookview Apartments. Rafferty first met with someone named Chuck, who left as Austin arrived in a white Chevrolet Lumina. Austin was in the front passenger's seat. Witts had met Austin once before and knew him as "Ghost."

Austin walked over to Rafferty's vehicle, a Range Rover, and got in the back seat, counted out some money and then said his "brother" had more money. Austin walked back to the Lumina and returned with Robinson, who climbed into the back

---

1. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

2. The material facts are not in dispute, since Robinson admitted shooting the victim, Kevin Rafferty. This recitation relies upon the State's answering brief.

seat of the Land Rover behind Witts. Austin and Rafferty then walked around to the back of the Land Rover to retrieve the marijuana.

After Rafferty and Austin left, Robinson pulled out a pistol, held it to Witts' head and told him not to move. Robinson then took Witts' cell phone and necklace as well as Rafferty's cell phone, which was on the console. Rafferty and Austin then returned and got back in the car, Rafferty in the front and Austin behind him in the rear passenger's seat. Austin grabbed Rafferty from behind and began choking him. The two fell out of the car and continued struggling. Witts remained in the vehicle with Robinson's gun pointed at his head.

Robinson then got out of the vehicle, and Witts, who had his head down, heard a gunshot. When he looked up, he saw the white Lumina speeding away. Rafferty had been shot. Witts helped him into the passenger's seat, found the car keys, which Austin had taken but then threw away, and drove through the neighborhood until he saw a mailman and asked for help. The mailman called 911.

Austin's version of the incident was somewhat different, downplaying his own role but still casting blame for the actual shooting on Robinson. According to Austin's testimony, on July 22, 2006, he drove to Delaware with Robinson to buy two ounces of "high quality" marijuana from Rafferty for $500. Robinson was supposed to chip in some of the purchase price.

When they arrived and parked, Austin walked over to Rafferty's Range Rover and got in the rear seat. He then called Robinson on his cell phone and told him to come over and add his money to the deal. Robinson did so, climbing into the rear seat behind Witts. Rafferty and Austin then went to the rear of the vehicle to retrieve the marijuana and consummate the deal.

Rafferty opened the back hatch of the Range Rover. He and Austin simultaneously saw that Robinson was holding a gun to Witts' head. Rafferty reached into the bag containing the marijuana and pulled out his own pistol. Austin grabbed Rafferty and they struggled. Austin pushed Rafferty to the ground and ran back to his car. He saw Robinson get out of the Range Rover and shoot Rafferty in the chest. He and Robinson then fled back to Philadelphia. Robinson showed Austin the proceeds of the robbery: marijuana, cell phones and necklaces.

New Castle County Police Officer Eric Biehl ("Officer Biehl") was the first to respond to the mailman's 911 call. He found Witts standing outside the Range Rober and Rafferty seated inside, "bleeding and not looking too well." As paramedics worked on Rafferty, Officer Biehl questioned him, "to just keep talking to him, keep him conscious, keep him thinking." Officer Biehl asked, "Who did this to you? Who are the suspects?" Rafferty replied, "Timothy Austin."

Robinson was apprehended in May 2008, nearly two years after the murder. He agreed to make a statement to police. Although he initially denied any role in the incident, he eventually admitted, not only that he was involved, but that he fired the shot that killed Rafferty. According to Robinson, he and Austin planned to rob Rafferty from the beginning. The videotaped statement was played to the jury.

### Police Report Contents

The State voluntarily provided Robinson's defense counsel with police reports and other material relating to the murder of Rafferty. These included a "Supplement Report" prepared by Detective Diane Smith ("Detective Smith"), the chief inves-

tigating officer, which collected and summarized the individual reports of all officers involved in the investigation. The defense was also provided with some of the individual reports. Names and addresses of certain persons contacted and interviewed by the police were redacted.

Among the individual reports forwarded to Robinson's defense counsel was one prepared by Detective Brian Grant ("Detective Grant"). Detective Grant's fourteen-page report contained summaries of his interviews with six witnesses. Three witnesses' names were redacted and three were not. The first witness interviewed was Witts. Witts' name was not redacted because he was a victim of the robbery. The second person interviewed was Albert Griffin ("Griffin"), whose name and address were redacted, as were the names and addresses of the next two witnesses. Detective Grant's report reads:

> [Blacked-out] advised that he is a close personal friend of the victim, Kevin Rafferty. [Blacked-out] advised that on July 18 or 19, 2006 he overheard a cellular phone conversation between Kevin and Timothy [Austin] via speaker phone. During this phone conversation Timothy threatens Kevin. [Blacked-out] could not provide writer with any further details in reference to this incident.

In her Supplement Report, Detective Smith summarized Detective Grant's report, beginning with Detective Grant's interview and re-interview of Witts, whose name again was not redacted. Immediately following the re-interview of Witts, as in Grant's report, is a summary of Grant's interview of Griffin:

> Grant conducted an interview with [blacked-out] who claimed that he was close friends with Rafferty. [Blacked-out] advised that he overheard a phone conversation between Rafferty and Austin sometime around July 18 or 19 where Austin threatened to harm Rafferty.

During the cross-examination of Witts, Robinson's defense counsel asked Witts whether he had told police he had heard Austin threaten Rafferty. Witts denied this. When defense counsel produced Detective Smith's report to refresh Witts' recollection, the prosecutor asked to approach the bench.

At a sidebar conference, the prosecutor explained that "the portion of the report [defense counsel] is talking about is referring to an interview with Albert Griffin. That is not this witness." Robinson's defense counsel said that he assumed the redacted portion was a continuation of the interview with Witts. The judge suggested that Robinson's attorney ask Witts a few questions to clarify that the witness who reported the threat was someone else. This was done when the cross-examination resumed.

### No Plain Error Review

■ Robinson argues that Detective Smith's Supplement Report, as redacted, led him to believe that the paragraph recounting Detective Grant's interview of Griffin was a continuation of his interview with Witts. The record reflects, however, that Robinson's attorney was also sent a copy of Detective Grant's original report in which it was clear that the individual reporting the threat was someone other than Witts. Robinson was sent the police reports two months in advance of trial. Robinson's defense counsel should have realized prior to trial that Witts was not the one who overheard Austin's threat. Accordingly, Robinson's argument that the State caused any confusion is without merit.

Nevertheless, for the first time on ap-

peal, Robinson contends that his *Brady*[3] rights were violated. According to Robinson, his defense attorney was misled by the police reports, as redacted, into believing that Witts told the police about Austin's telephone threat. Robinson argues that the threat by Austin was exculpatory as to Robinson and that the State breached its *Brady* obligation by not disclosing that it was Griffin rather than Witts who overheard the threat.

■ Robinson's failure to raise this *Brady* issue at trial means that it will only be reviewed on appeal for plain error.[4] Plain error assumes oversight.[5] The record reflects that there was no oversight. The subject matter of the *Brady* issue that is now alleged on appeal was made known on the second day of trial when Witts testified. If Robinson's attorney had raised a *Brady* claim promptly upon realizing that Witts had not overheard the threat, Griffin, who lived in Wilmington, could probably have been produced or subpoenaed as a witness for defense counsel's examination.

Robinson's attorney made a strategic decision not to raise a *Brady* claim at trial and not to try to compel Griffin to testify. That strategic decision is understandable for several possible reasons. First, *assuming arguendo* that Griffin's redacted statement was *Brady* material, it had been produced for the defense by the State. The attribution of the statement to Witts was an erroneous assumption by Robinson's defense attorney. Griffin's name would have been available prior to trial upon a timely request from the defense.

Therefore, there was no *Brady* violation. Second, it is not clear how any testimony from Griffin about animosity between Rafferty and Austin would be exculpatory for Robinson because Robinson admitted to the police that he shot Rafferty. Therefore, the statement by Griffin would not be *Brady* material. Third, the animosity between Rafferty and Austin was made known to the jury by other witnesses. Accordingly, Griffin's testimony on that subject would have been cumulative.

For any of these or other reasons, Robinson's attorney made a strategic decision not to pursue having Griffin testify. We have repeatedly held that strategic trial decisions by defense counsel will not be reviewed in a direct appeal for plain error.[6] Therefore, we will not undertake such review in Robinson's case.

### Impeachment Ruling Proper

■ Austin was charged as an accomplice for the murder and robbery of Rafferty. He accepted the State's offer to plead guilty to reduced charges and testify as a prosecution witness at Robinson's trial. Austin made a statement to police, which was recorded and which was turned over to defense counsel in discovery. Austin testified on the second day of trial and was cross-examined at length by defense counsel.

On the morning of the third day of trial, a question arose concerning Robinson's defense counsel's proposed cross-examination of Detective Smith, the chief investigating officer, who had taken Austin's prior statement. Defense counsel informed the trial

---

**3.** *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), requires the prosecution to disclose exculpatory evidence to the defense.

**4.** Supr. Ct. R. 8.

**5.** *Johnson v. State,* 983 A.2d 904, 923 (Del. 2009); *Tucker v. State,* 564 A.2d 1110, 1118 (Del.1989).

**6.** *Johnson v. State,* 983 A.2d at 923; *Wright v. State,* 980 A.2d 1020, 1024 (Del.2009); *Czech v. State,* 945 A.2d 1088, 1097 (Del.2008).

judge that he wanted to question the detective "about what Austin told her in that statement, and it's going to contradict what he said on the witness stand." Robinson's attorney acknowledged that he could also recall Austin as a defense witness and play his taped statement, but argued, "I think I'm entitled to do it both ways. I was hoping to do it the easier way this morning through [Detective] Smith."

The prosecutor objected and argued that the proper witness to examine regarding inconsistencies or contradictions in Austin's prior statement to Detective Smith was Austin, not the detective who took the statement and who had no personal knowledge of the facts recounted in the statement. The trial judge agreed and ruled that defense counsel must first confront Austin with any alleged inconsistencies or contradictions in his prior statement to Detective Smith. Robinson's attorney never recalled Austin to the witness stand and the prior statement was not introduced into evidence by either party.

The issue in this appeal is the use of a prior statement for impeachment purposes under Delaware Rule of Evidence ("D.R.E.") 613(b) and not its introduction as independent substantive evidence under title 11, section 3507 of the Delaware Code.[7] Under D.R.E. 613(b), "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon...."[8] In this case, although Austin had testified and was cross-examined, defense counsel did not ask any questions regarding his prior statement to

Detective Smith. Instead, Robinson's attorney waited until the following day to question Detective Smith regarding alleged inconsistencies between Austin's testimony and his statement to her.

The 1820 decision in *Queen Caroline's Case*[9] was the basis of the former requirements for impeaching a witness using prior inconsistent statements. Although disfavored in England, that decision was popular in the United States before the Federal Rules of Evidence modified it. *Queen Caroline's Case* required the cross-examiner to establish a foundation for introducing extrinsic evidence of the prior inconsistent statement by questioning the witness about the circumstances when the statement was made and verifying that the witness made it. This procedure required the cross-examiner to reveal the content of the prior statement to the witness before questioning and eliminated the element of surprise.

This longstanding procedure was modified by Federal Rule of Evidence ("F.R.E.") 613 generally, and F.R.E. 613(b) specifically has relaxed any absolute requirement that the procedure established in *Queen Caroline's Case* be followed in federal courts. Instead, the federal rule now only requires that the witness be afforded at some time an opportunity to explain or deny the prior statement and to be available for further interrogation. The purpose of the new rule was explained by the Reporter of the Committee on Rules of Practice and Procedure, of the Judicial Conference of the United States, as follows:

The traditional practice in most jurisdictions, when it is sought to impeach a

---

7. *See Woodlin v. State,* 2010 WL 2873881 (Del. July 22, 2010); *Blake v. State,* 2010 WL 2873823 (Del. July 22, 2010); *Stevens v. State,* 2010 WL 2873802 (Del. July 22, 2010).

8. D.R.E. 613(b).

9. *Queen Caroline's Case,* 2 Br. & B. 284, 129 Eng. Rep. 976 (1820).

witness by proof of a prior inconsistent statement, has been to require that a foundation be laid during the cross-examination of the witness. This foundation consists of directing the attention of the witness to the time when, place where, and person to whom the alleged statement was made, and asking the witness whether under those circumstances he made substantially that statement. In the absence of this preliminary routine, extrinsic evidence to prove the prior statement is held inadmissible.

The objectives of the procedure are: (1) to save time, since the witness may admit having made the statement and thus make the extrinsic proof unnecessary; (2) to avoid unfair surprise to the opposite party by affording him an opportunity to draw a denial or explanation from the witness; and (3) to give the witness himself, in fairness, a chance to deny or to explain the apparent discrepancy. These are desirable objectives. The second and third can, however, be achieved by affording an opportunity to explain at any time during the trial, and no particular time sequence is required. Only the first of the objectives named above, saving time, points in the direction of the traditional foundation requirement on cross-examination, and even here countervailing factors are present: the time saved is not great; the laying of the foundation may inadvertently have been overlooked; the impeaching statement may not have been discovered until later; and premature disclosure may on occasion frustrate the effective impeachment of collusive witnesses. The argument may be made that the recalling of a witness for further cross-examination will afford an ad-

equate solution for these difficulties and hence that the traditional procedure should be retained. The argument is not a sound one. In the first place, recall for cross-examination has traditionally been very much within the discretion of the judge and seems likely to continue so. And secondly, the admissibility of prior inconsistent statements ought not to be enmeshed in the technicalities of cross-examination when all that is being sought is the presentation of an opportunity to deny or explain.

In view of these considerations, the Advisory Committee concluded that the objectives could better be achieved by allowing the opportunity to deny or explain to occur at any time during the trial, rather than limiting it to cross-examination.

Moreover, occasionally situations may arise where the interests of justice will warrant dispensing entirely with the opportunity to explain or deny. Thus if a witness becomes unavailable through absence or death, the judge ought to have discretion to allow the impeaching statement.

In my view, the existing practice would continue in general to be followed under the rule. It is convenient and effective to raise the matter on cross-examination, and doing so would avoid problems that might ultimately arise if witnesses become unavailable before the end of the trial. The rule ought, however, to remain as drawn, leaving the practical approach to the good sense of the practitioner.[10]

The opinion in *Wammock v. Celotex Corporation*,[11] includes an excellent analysis of how the traditional foundation require-

10. Hearings before the Subcomm. on Criminal Justice on Proposed Rules of Evidence, 93d Cong., 1st Sess., ser. 2, at 74–75 (Supp. 1973).

11. *Wammock v. Celotex Corp.*, 793 F.2d 1518 (11th Cir.1986).

ments (*Queen Caroline's Case*) for allowing impeachment with prior inconsistent statements are modified by F.R.E. 613(b). The new federal rule requires that the witness be provided an opportunity to explain his or her inconsistent statement. However, this explanation may occur on direct examination or redirect examination, cross-examination or at any other point in the trial. Since the witness to be impeached must be given an opportunity to explain his or her inconsistent statements, the availability of the witness has become a touchstone of admissibility under Rule 613(b).[12]

Delaware Rule of Evidence 613(b) is identical to F.R.E. 613(b). Therefore, federal court decisions construing that rule are persuasive authority when we are called upon to interpret the corresponding Delaware rule. The federal decision in *Wammock* explains F.R.E. 613 and its modification of *Queen Caroline's Case:*

> Traditionally, prior inconsistent statements of a witness could not be proved by extrinsic evidence unless and until the witness was first confronted with the impeaching statement. Rule 613(b) modifies this approach, however, by merely requiring that the witness be provided an opportunity to explain the statement at some point in the proceedings. There need be no particular sequence or timing, so long as the witness has that opportunity to explain the statement.[13]

 F.R.E. 613(b) and subsequent case law interpreting that rule reflect that the strict sequencing procedure established in *Queen Caroline's Case* is now unnecessary under the Federal Rules of Evidence. Nevertheless, as the opinion in *Wammock* noted, "[i]t is equally clear, however, that Rule 613(b) does not supplant the traditional method of confronting a witness with his inconsistent statement prior to its introduction into evidence as the *preferred* method of proceeding."[14] We agree. Although D.R.E. 613(b) vests the trial judge with broad discretion regarding the introduction of prior inconsistent statements for impeachment purposes, the traditional sequencing procedure recognized in *Queen Caroline's Case* is the preferred methodology. Accordingly, we hold that the trial judge did not violate Robinson's constitutional rights and did not abuse his discretion by requiring Robinson's attorney to follow the traditional sequencing procedures for impeaching a witness with a prior inconsistent statement.

### Conclusion

The judgments of the Superior Court are affirmed.

---

12. *Id.* at 1522.

13. *Id.* at 1521–22.

14. *Id.* at 1522 (citing *United States v. Barrett*, 539 F.2d 244, 255–56 (1st Cir.1976)).