**UNITED STATES of America,**
**Appellee,**

**v.**

**Sidney A. LITTMAN, Appellant.**

**No. 205, Docket 33682.**

United States Court of Appeals, Second Circuit.

Argued Oct. 16, 1969.

Decided Jan. 21, 1970.

Alfred D. Lerner, Richmond Hill, for appellant.

James D. Zirin, Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty., for the Southern District of New York, James Schreiber, Asst. U. S. Atty., on the brief), for appellee.

Before FRIENDLY, HAYS and ANDERSON, Circuit Judges.

HAYS, Circuit Judge:

Sidney A. Littman appeals from a judgment of conviction entered after a jury trial in the United States District Court for the Southern District of New York. Littman was convicted, along with five co-defendants, of nine counts including wire fraud, 18 U.S.C. § 1343

---

(1964), mail fraud, 18 U.S.C. § 1341 (1964), use of interstate facilities to promote an unlawful activity, 18 U.S.C. § 1952 (Supp. IV 1965–68), and conspiracy, 18 U.S.C. § 371 (1964).

Littman claims *inter alia* that the evidence introduced against him was insufficient to support his conviction; that the admission of certain testimony of a victim of the conspiracy requires this court to reverse under the rule announced in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); and that the admission of a tape recording made by one of the victims of a conversation he had with appellant, and the subsequent failure to play this tape to the jury, constitute reversible error.

We find no merit in these or appellant's additional claims of error and therefore affirm the judgment of conviction.

## I.

The trial testimony proved the existence of an astonishing scheme involving Littman, who was a lawyer, and six others which eventually defrauded two groups of businessmen out of approximately 1.3 million dollars.

The scheme began with the false claim that the conspirators could obtain Cadillac agencies for the victims. To this end they were persuaded to deposit large amounts of money in escrow with Littman. It was represented that this money was to be used to bribe officials in the Cadillac organization. Later the victims were encouraged to participate in a gambling game with an entirely fictitious "eccentric millionaire." Finally the victims were told that they had suffered huge gambling losses, and threatened with bodily injury unless they paid these debts. The first group of victims paid by signing releases, prepared by appel-

lant for the funds he supposedly held in escrow.[1] The second group of victims was not so easily frightened and when pressed to pay, reported the swindle to the F.B.I.

Taking the evidence, as we must, in the light most favorable to the government, see e. g., United States v. Dardi, 330 F.2d 316, 325 (2d Cir.), cert. denied, 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964), we find that the jury had sufficient grounds upon which to reach its conclusion as to appellant's guilt.

That evidence can properly be viewed as establishing that Littman was present at meetings of the conspirators at the home of one Salvatore Marino when details of the fraudulent scheme were being planned, that he disbursed the proceeds of the fraud to Marino and Marino's creditors, then he went with Marino to the race track where Marino bet what the jury could have concluded was a part of the funds supposedly held by Littman in escrow, that he prepared and accepted delivery of releases from two of the victims when it was fair to assume he knew that they were acting under threat of physical injury, and that he accepted further payments from some of the victims when it was fair to assume he knew of the threats to others.[2]

## II.

At the trial, George Desser, one of the victims of the fraud, related the contents of a telephonic conversation between his wife and Salvatore Marino, one of the co-conspirators, which Desser overheard. The relevant portion of Desser's testimony is as follows:

Q. And on Saturday, May 25 about 9:30 in the evening, did there come a time when you received a call from Mr. Marino? A. Yes, I did and, as I say, I can't recall every one of these calls. I believe he said "You had

---

1. The testimony shows, and Littman concedes, that he never respected his escrow obligations.

2. Appellant's contention that there was no proof adduced to show that he knew

interstate facilities were to be used is without merit. The jury was certainly entitled to find on the basis of the part he played in the scheme, that Littman was aware that these facilities would be used.

some nerve talking that way. Blacky meant every word that he said that Saturday night and these union boys"—excuse me, just a minute, I am trying to see if I can remember.

"He meant every word that he said that Saturday night and your husband is in terrible danger and in terrible trouble and these union boys are real tough."

Q. Do you recall anything else that was said? A. Yes, he said, "We'll be over to get you and we'll put you through a torture the likes of which you have never seen."

Q. Do you remember anything else that was said? A. *Yes, he said to my wife, "Mr. Littman is the only swindler in our gang"*—

Mr. Wallach: Your Honor, I am going to object to this.

The Court: Yes, it is taken subject to connection as to Mr. Littman. You have to find that there was a conspiracy, that Mr. Littman was a part of it and that this was done in furtherance of the conspiracy during the life of the conspiracy before you may apply it to Mr. Littman.

What did he say?

The Witness: *Mr. Marino said that "Mr. Littman is the only swindler in our gang that has a law degree and I need him for the legal end of our scheme."* (Emphasis added.)

■ Littman contends that the admission of the italicized comments require this court to reverse under Bruton v. United States, *supra*, despite the fact that the trial judge subsequently ruled the statement admissible only against Marino.

*Bruton* is inapposite. There the challenged statement was a co-defendant's confession made to a government agent after the confessing defendant's arrest. *Bruton* held that a trial judge's instruction to confine the effect of such evidence to the author of the confession was insufficient to protect a co-defendant from prejudicial effect.

The instant case presents quite a different question. Here, since there was substantial independent evidence of Littman's participation in the conspiracy, testimony as to statements by a co-conspirator in the course of the conspiracy was properly admitted as a declaration made in furtherance of the conspiracy. United States v. Pugliese, 153 F.2d 497, 500 (2d Cir. 1945); Van Riper v. United States, 13 F.2d 961, 967 (2d Cir. 1926).

### III.

■ It is argued that the admission of a tape recording made by one of the victims of the conspiracy of a telephone conversation he had with Littman constitutes reversible error. Reliance is placed primarily on Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L. Ed.2d 576 (1967). *Katz* held that evidence acquired by bugging of a telephone booth without a warrant was inadmissible when the evidence consisted of a conversation between two persons who were both unaware of the bugging. This court has held where one party to the conversation consents to its being monitored, *Katz* does not apply. United States v. Polansky, 418 F.2d 444 (2d Cir. Oct. 27, 1969); United States v. Kaufer, 406 F.2d 550 (2d Cir.), affirmed, 394 U.S. 458, 89 S.Ct. 1223, 22 L.Ed.2d 414 (1969), on the basis of Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969). Appellant's contention that 47 U.S.C. § 605 (Supp. IV 1965–68) was violated by the recording and that his conviction must therefore be reversed is equally unpersuasive. Rathbun v. United States, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957); see Lee v. Florida, 392 U.S. 378, 381, 88 S.Ct. 2096, 20 L.Ed.2d 1166 (1968).

■ Having argued at the trial that the tape was inadmissible, appellant now contends that the tape was exculpatory and the failure of the trial court to have

it played to the jury constitutes reversible error. If the tape was truly exculpatory appellant could have used it on cross-examination but chose not to do so. We have examined a transcript of the tape in question and conclude that the failure to have it played to the jury in no way prejudiced appellant.[3]

Affirmed.

ANDERSON, Circuit Judge (concurring):

In view of my brother Friendly's dissent, I will comment briefly on the nature of the connection between the conspiracy and the quoted testimony, which persuades me that the Marino-Desser telephone conversations were in furtherance of the conspiracy and that Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) is not applicable.

The victims of the fraudulent scheme were business men who fell into roughly two groups: Desser and Bernstein were identified with one, and the Shapiros with the other. There was, however, but one conspiracy and one set of co-conspirators who mulct all those whom they could ensnare.

The time came when the conspirators became convinced that they had squeezed the last sou out of Desser, but his money had been deposited in escrow with Littman and he had signed and delivered releases, drafted by Littman and running to Littman and Marino, stating that he, Desser, no longer had any claim to the funds. To discourage Desser from entertaining the idea that he might take some legal action to void the releases and recover his money, it was important to the conspiracy to convince Desser that Littman was acting as lawyer for the conspirators, that he had seen to it that they were in a legally sound position, and that it would be

hopeless and futile to attempt any such thing. In addition to this, the threats of torture and other reprisals were designed to keep Desser *in terrorem* and fully convinced that any attempt at recovery would be not only useless but dangerous.

There is another reason why it was essential to the furtherance and successful completion of the conspiracy that Desser be kept in a condition of helplessness and abject fear, and that is, that the Shapiros had only paid over a part of what the conspirators expected to extract from them. If Desser told them of the fraudulent nature of the scheme, the Shapiros would refuse to make any further payments. This was a problem built into the nature of the conspiracy where the plan was to extort money out of several persons nearly contemporaneously. Once a victim had been cleaned out and realized that he had been defrauded, he was likely to reveal what had happened, and the conspiracy would be disrupted before it was carried to its full fruition. It was, therefore, a part of the plan to make the earlier victims so terrified that they would be afraid to speak.

This is distinguishable from Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949); Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 919 (1953); and Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), which held that a subsidiary conspiracy to conceal the crime and avoid detection and punishment will not be implied as a part of the original conspiracy, the criminal purposes of which have been achieved. Rather, the present case comes within the exclusion from that rule, which the Court stated as follows:

"By no means does this mean that acts of concealment can never have

3. In United States v. Marino, 421 F.2d 640, decided January 14, 1970, the conviction of Littman's co-conspirators on counts 5 and 6 was vacated on grounds not raised on Littman's appeal. The court in *Marino* found that the vacating of the

conviction on counts 5 and 6 did not require remand for resentencing because of the concurrent sentence doctrine. See United States ex rel. Weems v. Follette, 414 F.2d 417 (2d Cir. 1969).

significance in furthering a criminal conspiracy. But a vital distinction must be made between acts of concealment done in furtherance of the *main* criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime." Grunewal v. United States, *supra* at 405, 77 S. Ct. at 974.

The trial judge's original ruling was correct and when he reversed himself and instructed the jury to disregard the testimony in question, he gave Littman an advantage to which he was not entitled. The statements were admissible as made in furtherance of the conspiracy and are not barred by the rule in the *Bruton* case.

FRIENDLY, Circuit Judge (dissenting).

If the trial judge had ruled that the description of Littman alleged to have been incorporated in Marino's telephone call was in furtherance of the conspiracy, I would have accepted the ruling on the grounds elaborated in Judge Anderson's concurring opinion. Indeed I might well have so ruled had I been presiding at the trial. But the judge found otherwise, and there was warrant for his considering the statement to have been simply a piece of gossip. We should give the same respect to such a negative determination on a preliminary question of fact relating to admissibility as when the determination goes the other way. See United States v. Lopez, 420 F.2d 313 (2 Cir. 1969).

Once that position is accepted, Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), calls for reversal. While that case involved a confession by a coconspirator and this does not, *Bruton* was not limited to the precise facts there presented. The decision extended to other instances of the receipt of inadmissible hearsay where "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored" 391 U.S. at 135, 88 S.Ct. at 1627. The Court's further statement, "Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial," 391 U.S. at 135–136, 88 S.Ct. at 1628, fits this case exceedingly well.

I would reverse for a new trial.