UNITED STATES of America, Plaintiff-Appellee,

v.

**Earl L. KRAMER, Defendant-Appellant.**

No. 74–1108.

United States Court of Appeals, Tenth Circuit.

Submitted Sept. 13, 1974.

Decided Jan. 6, 1975.

Rehearing Denied Oct. 2, 1975.

John W. Madden, III, Sp. Asst. U. S. Atty., Denver, Colo. (James L. Treece, U. S. Atty., on the brief), for plaintiff-appellee.

Lawrence M. Henry, Denver, Colo., for defendant-appellant.

Before MURRAH, SETH and BARRETT, Circuit Judges.

MURRAH, Circuit Judge.

Upon a trial to a jury appellant Kramer was convicted and sentenced on a charge of conspiracy (18 U.S.C. § 371) to violate 18 U.S.C. § 1001 [1] by knowingly making or causing to be made false, fictitious and fraudulent representations in an application to the Small Business Administration for the guaranty of a bank loan to the Simeone Brothers Potato Company, Inc. As we read the rambling and prolix indictment, it alleges the making of false representations in the

---

1. The statute in full reads: "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

application as to material facts, to wit, (1) the financial condition of the Potato Company and (2) the intended purposes of the loan. It charges that these false representations caused the SBA to consider more favorably the guaranty of 90% of a $180,000 loan to the Potato Company by the First National Bank of Fleming, Colorado, of which Kramer was president; that, as part of the conspiracy, Kramer would receive $15,000 of the loan proceeds; and that his personal interest in these proceeds would be concealed from the SBA. Twenty-two overt acts are alleged in furtherance of the conspiracy between Kramer and two unindicted coconspirators, company owner Anthony Simeone and SBA loan officer Jack L. Biggs.[2]

■ The court's instructions were not brought forward on this record, and we shall proceed on the premise that they correctly stated the law of the case. Suffice it to say, for our purposes, that it was incumbent upon the government to prove to the satisfaction of the jury beyond a reasonable doubt that Kramer, Simeone, and Biggs formed an agreement, however clandestine or informal, to violate 18 U.S.C. § 1001 by the making of false representations in an application to the SBA concerning a material fact—i. e., either (1) the financial condition of the Potato Company or (2) the intended purposes of the loan;[3] and that someone committed an overt act in furtherance of this object. Kramer argues that the evidence was insufficient as a matter of law to support the finding of his guilt, especially in view of the erroneous admission of hearsay evidence.

We are mindful that the government's case has survived motions to dismiss and for directed verdict for the insufficiency of the evidence by the rulings of an able and experienced trial judge. In this posture, we should not disturb the verdict unless convinced that the evidence, considered in its most favorable light, is wholly insufficient to take the case to the jury. See United States v. Kramer, 500 F.2d 1185 (10th Cir. 1974).

This brings us to an analysis of the facts of record. In essential outline, the proof was to the effect that the Simeone brothers owned a number of closely knit incorporated businesses, one of which was a wholesale potato company. Apparently, the Simeones interchanged assets and liabilities between these corporate businesses as best suited their personal and business convenience.

Faced with a financial crisis in early 1970, the Simeones turned to their longtime friend and banker, Kramer. On several occasions, Kramer and the Simeones discussed the financial condition of the Company. Kramer indicated that he knew someone at the SBA and might be able to arrange an SBA loan guaranty. At some time during the discussions and negotiations Kramer told Simeone that the loan might "cost something." As a result of these discussions, Anthony Simeone and Walter Meisel, the Company's long-time accountant, traveled to Kramer's home with pertinent Company records in August, 1970. There, the three of them discussed the Company's financial affairs and roughed out an application for an SBA guaranty on a $180,000 loan to be made by Kramer's

---

**2.** The second count of the indictment charged Kramer with the substantive violation of 18 U.S.C. § 1001 by the same false representations in the application pertaining to the Potato Company's financial condition. The court directed a verdict on this count holding in effect that the evidence was insufficient to take the case to the jury on the substantive offense but sufficient on the conspiracy offense.

**3.** 18 U.S.C. § 1001 embraces in the disjunctive the separate offenses conjunctively

charged in the indictment as one offense, so that proof of a conspiracy to make a false representation in the application as to either the financial condition of the Potato Company or the intended purposes of the loan will warrant a conviction on this indictment. Turner v. United States, 396 U.S. 398, 420, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970); United States v. Dinneen, 463 F.2d 1036 (10th Cir. 1972); Troutman v. United States, 100 F.2d 628 (10th Cir. 1938).

bank. In the course of this three hour conference, they discussed certain assets and liabilities on the Company books which were not directly related to the wholesale · .potato operation. Kramer suggested that if these assets and liabilities were shown on the application, the Potato Company would not have a "good chance to get the loan" and that they should "come out." Meisel, who assumed the responsibility for preparing the application, then pencilled an abbreviated notation of the assets and liabilities that were to come out.

In the office preparation of the application and under 9(c), entitled "Surplus Analysis or Net Worth Reconciliation," in the column for "Withdrawals," Meisel entered the words "Net Assets" and the amount of $57,287 in parenthesis (apparently indicating deduction from total net worth). On trial, he explained in some detail that this sum of $57,287 was arrived at by deducting the liabilities "left off" from the assets "left off," as shown on the business records of the Potato Company. These were the items which were discussed at the conference and which Kramer had suggested should come out. A list of these items was received in evidence. It showed assets of $182,299 and liabilities of $125,012, leaving a net of $57,287. Among the listed assets was a $115,200 "investment" in a dog track and a $9,600 "investment" in Kramer's bank. The assets and liabilities left off the application submitted August 24, 1970, were also left off the supplement submitted December 14, 1970.

Meisel testified that the $57,287 was intended to be a reconciliation of the assets and liabilities shown on the application with the assets and liabilities shown on the Potato Company records. He was careful, however, to say that he did not undertake to give an audited opinion or to verify the value or authenticity of the listed items.

There was some proof to the effect that the $115,200 dog track item was worthless and that the $9,600 "investment" in Kramer's bank was in fact a Simeone debt to the bank rather than an asset. The government suggests that if the true value of these assets had been used, the application would have shown a withdrawal of net liabilities rather than one of net assets; that the effect of the withdrawal was to exclude from the application actual liabilities by balancing them against fictitious assets.

While the application was pending, Kramer highly recommended the Potato Company's application to the processing SBA officer. There was testimony that the application was considered "marginal" and that if there had been any change in the listed assets and liabilities, it would probably have been declined.[4] After approval of the loan and authorization of disbursement on December 23, 1970, the loan funds were disbursed by Kramer's bank to the Potato Company account in two installments—$125,000 on December 23 and $55,000 on December 28.

Meanwhile, on December 22, a $15,000 check was drawn on the Potato Company payable to Dant Slack, a potato dealer in Monte Vista, Colorado, and a creditor of the Simeones. After receiving this check in Monte Vista from Simone, Slack cashed it on December 24, and the check cleared the Potato Company account when the only funds available in the acccount were the SBA loan proceeds. On December 28, Slack purchased a $15,000 cashier's check and on the same date sent it by airplane to Simeone in Denver. Simeone and Kramer went to the airport, picked up the check, and Simeone cashed it the same day, receiving $15,000 in $100 bills, all of which Simeone gave to Kramer. On December 29, Kramer deposited $7,000 in currency in his personal savings account at a Sterling, Colorado, bank; and on December 30, he purchased a $7,000 participation in the unguaranteed 10% of the SBA loan in a cash transaction using all $100 bills. Cross examination developed the fact

---

4. But see 15 U.S.C. 636(a)(1) to the effect that all SBA loans are only marginally bankable: "No financial assistance shall be extended . . . unless . . . not otherwise available on reasonable terms."

that Simeone had been a participator with Kramer in the unguaranteed portion of two other loans; that Simeone had "given Mr. Kramer a lot of money over the years and that he [Kramer] put it where he thought best"; and that he expected a return of the money from Kramer.

From all the evidence, Kramer argues that the government failed to make a case. He maintains that his only participation in the preparation of the application was to discuss certain unrelated items (assets and liabilities) and to recommend that they be left out of the application; that this recommendation had the purpose and effect of causing the application to speak the truth and was in nowise false. He points to the fact that the application was made by the experienced C.P.A. Meisel who testified that it accurately represents the financial records of the Potato Company. He challenges the record for evidence to justify the inference that he agreed with anyone to make false representations as to any material fact in the application.

The $57,287 entry seems to be the heart of the government's contention that the application falsely represented the financial condition of the Potato Company. After all the discussion about it, we remain uncertain of the significance of this entry in the context of the application. As we read and understand the entry, it was carried neither as an asset nor as a liability. Meisel testified on cross examination that it was a reconciliation of the application with the company records and that he put it under "Surplus Analysis or Net Worth Reconciliation—Withdrawals" because he "found no better place to put it." Moreover, he agreed that this treatment of the assets and liabilities was a "legitimate procedure" and that it accurately reflected the financial records of the Potato Company. It may well be that the financial records themselves were in part fictitious and that the entry was therefore deceptive. But even so, there is nothing in this record from which it can be inferred that Kramer suggested the entry or that he had anything whatsoever to do with it other than to suggest the admittedly legitimate procedure of leaving out certain items because they did not relate to the potato business.[5]

Meisel, who made the entry and vouches for its appropriateness, was neither charged with the offense nor named as a coconspirator in this indictment. Though loan officer Biggs was named as a coconspirator, there is no probative evidence of his knowledge or participation in the making of the application. A Mr. Bailey of the SBA actually processed the application for the guaranty. He testified that he interviewed Kramer by telephone and the Simeones in person at both their place of business and at the SBA offices; and that the Simeones were at his desk in connection with the loan application "many times." He also testified that Simeone was in the office of coconspirator Biggs, Bailey's supervisor, several times, and we may validly assume that Simeone's visits with Biggs were in connection with the application. But there is nothing to indicate, or from which it can be inferred, that the visits were in any way sinister or conspiratorial. Certainly, there is nothing from which it can be inferred that Biggs formed or participated in an agreement of any kind. Simeone, who was produced as a government witness, testified without contradiction that he attended the conference and signed the application but he "never paid much attention to the books" and relied upon his accountant Meisel. In this posture of the case, we are unable to discern wherein on this record two or more persons agreed to knowingly make or cause to be made false statements in the application concerning the financial condition of the Potato Company.

 We think, however, the evidence is entirely sufficient to support a finding

---

**5.** Apparently, it was the court's appraisal of this evidence that prompted it to direct a verdict of acquittal on the substantive charge that Kramer himself made or caused to be made false representations in the application concerning the financial condition of the Potato Company.

that Kramer and Simeone conspired to misrepresent the purposes for which the loan proceeds were to be used; that Kramer was to receive $15,000 of the proceeds; and that it would be concealed from the SBA. The application explicitly stated that $160,000 of the loan proceeds were to be used for "Working Capital—Inventory" and the remaining $20,000 for "Acquisition and/or Repair of Machinery and Equipment." There was direct evidence that Kramer first suggested the idea of an SBA loan guaranty and that it might "cost something"; and that he participated and counseled in the preparation of the application. As president of the lending bank and based on his participation, it is fairly inferable that Kramer knew that the application did not contemplate that he should receive any part of the loan proceeds, and there is direct evidence that he did receive $15,000 of these proceeds. The surreptitious manner in which Kramer and Simeone consummated the transaction certainly lends credence to the government's contention that it was part of an agreement to misrepresent the intended purposes of the loan and to divert the proceeds from the purposes for which the loan was made and to conceal that fact from the SBA.

But the government was not content to rest its case on the inferences to be drawn from these facts. Slack of Monte Vista, an innocent party to the $15,000 transaction, was called to testify over hearsay objection that Simeone had told him that "he [Simeone] had to give Mr. Kramer $15,000 to get the loan." Simeone was later called as a government witness, but he was not questioned by either the prosecution or the defense concerning his alleged out-of-court declaration.

Slack's testimony was, of course, pure hearsay. Kramer strenuously contends that it was calculated to poison the minds of the jury and that it was reversibly erroneous, especially in view of the failure of the prosecution to question Si-

meone as to his own alleged declaration. As hearsay, it would be clearly inadmissable in most any trial other than a conspiracy case. This tactic is reminiscent of Mr. Justice Jackson's caustic observations on hearsay evidence in conspiracy trials in his concurrence in Krulewitch v. United States, 336 U.S. 440, 445, 453, 69 S.Ct. 716, 719, 723, 93 L.Ed. 790 (1949). He characterized the crime of conspiracy as an "elastic, sprawling and pervasive offense . . . so vague that it almost defies definition" and warned especially against the "hazard from loose application of rules of evidence" in a prosecution for this crime. We subscribe to Mr. Justice Jackson's insistence on a narrow application of the exception to the hearsay rule in cases of this kind.

 We are nonetheless constrained to conclude that the exception was applied within proper bounds in our case. It is settled as an exception to the hearsay rule that statements by a coconspirator made in furtherance of a conspiracy which has been established by competent evidence are admissable against an alleged conspirator, and the order of proof is a matter within the discretion of the trial court.[6] As we have seen, the existence of a conspiracy and Kramer's complicity are shown by direct evidence quite apart from the hearsay testimony. The jury certainly could have inferred from the oral and documentary evidence that the payment of loan proceeds was to be made and was in fact made to Kramer in return for his assistance in obtaining the loan. And this evidence was produced at trial before the admission of the hearsay evidence bearing on the same issue. Under these circumstances, Slack's hearsay testimony comes within the narrow bounds of the exception to the hearsay rule.

The failure of the government to inquire of Simeone concerning the truth of the hearsay statement can be justified only in terms of trial strategy, a matter within the competence of counsel and

---

6. See generally McCormick, Evidence 645 (1972); Davenport, The Confrontation Clause and the Co-conspirator Exception in Criminal Prosecutions: A Functional Analysis, 85 Harv.L.Rev. 1378, 1385 (1972), and cases cited therein.

not revealed on this record. Such a tactic betrays the truth-finding function of the prosecution, and we cannot condone it. But we know of no legal or ethical rule to condemn it. And we cannot say that it was so prejudicial as to require reversal on that ground alone.

We conclude that the evidence was sufficient to justify the inference that Kramer and Simeone conspired to violate 18 U.S.C. § 1001 by falsely representing in the SBA application the purposes for which the loan guaranty was to be made. The hearsay evidence which was admitted to support the prosecution's case comes within the narrow exception for coconspirator's declarations. In these circumstances, we cannot say that the trial court was clearly wrong in submitting the case to the jury, and we will not disturb the verdict.

The judgment is affirmed.