UNITED STATES of America, Appellee,

v.

Bernard Vincent MONTGOMERY, Appellant.

No. 77–1107.

United States Court of Appeals, Tenth Circuit.

Decided June 29, 1978.

Argued and Submitted March 14, 1978.

Rehearing Denied Sept. 1, 1978.

---

David L. Norvell, Albuquerque, N. M., for appellant.

Charles F. Sandoval, Asst. U. S. Atty., Albuquerque, N. M. (Victor R. Ortega, U. S. Atty., Albuquerque, N. M., on the brief), for appellee.

Before HOLLOWAY, BARRETT and McKAY, Circuit Judges.

BARRETT, Circuit Judge.

Bernard Vincent Montgomery (Montgomery) was charged in a five-count indictment with conspiracy, interstate transportation of stolen motor vehicles, and aiding and abetting, in violation of 18 U.S.C.A. § 371, § 2313, § 2312, and § 2. He was convicted by a jury on all counts and now appeals.

Montgomery and Glenn Langston (Langston), Arthur Apodaca (Apodaca), Freddie Herrera (Herrera), and Douglas Steen (Steen) were charged with selling in interstate commerce a D–3 Caterpillar tractor and 1974 Peterbilt truck, knowing that the vehicles were stolen. Prior to Montgomery's trial, Langston and Herrera had entered pleas of guilty, the charges against Steen had been dismissed and Apodaca was at large, having avoided arrest.

The Government's case against Montgomery primarily relied upon the testimony of numerous witnesses, including:

Robert Bettes, Police Officer, City of Albuquerque who testified that: the Albuquerque Police Department set up "Operation Gooseneck" in August, 1975, as an undercover operation in the form of a welding shop business staffed by Officers Wroten and Espinosa; the operation was designed to apprehend persons involved in the theft and disposal of stolen heavy equipment; the operation was funded by the Albuquerque City Council; and that from November, 1975, through August, 1976 approximately $500,000 worth of stolen property was received via the operation.

John Way, President of J&H Supply Company, who testified that: a tractor trailer laden with machinery, including a D–3 Caterpillar was stolen from his company on or about April 26, 1976; and the Caterpillar had a replacement value of $32,000 to $33,000.

G. W. Penfold, District Manager of Wilco Truck Rental, who testified that: on reporting to work on June 22, 1976, he noticed that a truck was missing; the truck a 1974 Peterbilt, was on a long term lease to E. B. Law; the replacement value of the truck was approximately $30,000; and that when the truck was returned to Wilco its paint had been altered with black spray paint which was used to cover the E. B. Law signs and other areas on the truck.

James Wroten, Detective, Albuquerque Police Department, who testified that: he participated in an undercover capacity during Operation Gooseneck as a welder; during the operation he established a relationship with Langston and Montgomery whereby he was buying stolen property from them; on April 27, 1976, he and Detective Espinosa met with Langston who related he had a D–3 Caterpillar for sale which his boys, including Montgomery, were repainting; Langston indicated he had other equipment for sale but that Montgomery had moved it to a church; Langston and Montgomery arranged for the rental of a truck to move the Caterpillar and Montgomery and Apodaca later hauled the Caterpillar to El Paso, Texas, to a prearranged site for the purpose of consummating the sale of the Caterpillar; thereafter, Montgomery discussed acquiring Peterbilt and Kenworth trucks with him; on June 22, 1976 Montgomery called him about a truck he had acquired and altered with black spray paint; Montgomery related that he had sprayed the door decals which "were E.B. Law" and other areas of the truck; he subsequently

took delivery of the truck at El Paso, thereafter paid Montgomery a total of $2,000 for the truck.

Richard Espinosa, a Police Officer with the Albuquerque Police Department, who testified that: he participated in Operation Gooseneck in an undercover capacity as a welder; the operation was initiated after the Albuquerque Police Department recovered a gooseneck trailer "and through this recovery they received the information on various people involved in heavy equipment thefts, and at that time they decided to open up the store (undercover welding business)"; he accompanied Officer Wroten and Langston to Langston's property where a D-3 Caterpillar was hidden; "Langston stated that his boys, meaning Bernie Montgomery and Arthur Apodaca, had put some paint remover on the D-3 to discolor the D-3"; Langston also showed them some other equipment stolen from J&H Supply Company, located next to a church, which had the same distinctive blue coloring as the Caterpillar; Montgomery and Apodaca trucked the Caterpillar to El Paso, Texas; on June 14, 1976, he and Officer Wroten met with Montgomery who related to them that he could steal a new Kenworth or Peterbilt and sell it to Wroten for $2,000; later Montgomery told them he had a Peterbilt located in El Paso, Texas, which he had painted with black paint to discolor the decal on the truck and that Montgomery "reached up with his hands and said 'I still have black paint on me'"; Apodaca later related that he and Freddie Herrera "ripped off the truck"; he and Officer Wroten later took delivery of the truck.

The Government identified the stolen vehicles by means of testimony and photographs.

Montgomery did not testify. He did, however, call two defense witnesses:

Robert Montoya, an officer with the Bernalillo County Sheriff's Department, who testified that: he had met Montgomery once at a bar; Montgomery talked about the "low fencing operation" being operated out of Louie's Garage (the undercover business); Montgomery's conversation of the "low fencing operation" was not consistent with somebody who was engaged in criminal conduct themselves. On cross-examination Montoya indicated that he did not report Montgomery's discussion to the authorities; that he figured the discussion "might have been a crank thing"; and that "You hear so much of that stuff. I told him to notify the proper authorities."

Fred Herrera, a co-defendant who had entered a plea of guilty to aiding and abetting, testified that he and Arthur Apodaca told Montgomery that the Peterbilt had belonged to Arthur's deceased father. On cross-examination, the Government's Exhibit 12 was admitted into evidence. Exhibit 12 was a prior statement by Herrera that "I have no information or knowledge that would tend to exonerate Bernard Montgomery on the charges contained in the indictment."

Herrera's testimony was interrupted for an *in camera* discussion relating to Defendant's Exhibit B, a notarized letter written by Apodaca to Montgomery on or about August 9, 1976, several months after the Peterbilt was stolen, which Herrera had previously seen. Although the letter was not included in the record on appeal, its content, as gleaned from the record [R., Vol. IV, pp. 386–390] constitutes Apodaca's apology to Montgomery for lying to Montgomery about the ownership of the truck because as a result of the lie Montgomery was not aware that the truck was stolen. The trial court denied the admission of the letter in evidence both because it was hearsay (Apodaca was then still at large) and because it had been written "long after the conspiracy, if any, had expired." [R., Vol. IV, p. 389.]

At the conclusion of Herrera's testimony, Montgomery rested his case. Thereafter, as noted, *supra*, Montgomery was convicted by the jury on all five counts charged.

On appeal Montgomery sets forth two issues: (1) Whether or not the trial court's

ruling that Agent Espinosa could testify as to extrajudicial hearsay statements of one Arthur Apodaca, an alleged co-conspirator, which were inculpatory of Montgomery, at a time when the said Arthur Apodaca was a fugitive from justice and not subject to being confronted and cross-examined, was erroneous?; and (2) Whether or not, given the court's ruling above, the trial court erred in refusing into evidence the tender of proof made by Montgomery which constituted evidence exculpatory of Montgomery by the same co-conspirator, Arthur Apodaca?

## I.

■ Montgomery contends that the trial court erred in allowing Agent Espinosa to testify relative to a conversation he had had with Apodaca, inculpatory of Montgomery, at a time when Apodaca was at large and unable to be confronted and cross-examined. Montgomery argues that "he was denied the opportunity and his constitutional right to confront and cross-examine Arthur Apodaca, who in effect became a witness against the appellant, by virtue of the introduction into evidence of a declaration by Arthur Apodaca through Officer Espinosa." We hold that Montgomery's contention is without merit.

Nothing contained in Montgomery's brief constitutes cogent authority or argument supportive of his contention that defendants in criminal proceedings have a constitutional right to deny the admission in evidence of statements made by a co-conspirator whenever the co-conspirator is unavailable at trial for confrontation and cross-examination. Our independent research has failed to disclose any support for this contention. The challenged testimony of Espinosa occurred during direct examination, as follows:

Q. . . . Mr. Espinosa, the last thing that I asked you was—or that you were about to comment on a conversation that you had with Mr. Apodaca. Will you tell us what he said, what you heard him say.

A. Okay. We went into the restaurant and sat down, had ordered some coffee. At that time Mr. Apodaca stated that he had tried—him and Freddie Herrera tried to rip—or ripped off the truck Sunday night and didn't have any problems getting it down there. . . . He stated that Mr. Montgomery has paid him a hundred dollars but that he had given it to Freddie Herrera and he didn't have any money at the time.

Q. He said that Montgomery paid him.

A. Yes.

[R., Vol. IV, p. 300.]

Fed.Rules Evid.Rule 801(d)(2)(E), 28 U.S. C.A., provides that a statement is not hearsay if made "by a co-conspirator of a party during the course and in the furtherance of the conspiracy." The statements made by Apodaca to Espinosa were made by a co-conspirator during the course of and in furtherance of the conspiracy, i. e., when the undercover agents were in El Paso to pick up the stolen Peterbilt truck. We have repeatedly followed a similar standard. In *United States v. Pennett*, 496 F.2d 293 (10th Cir. 1974), we observed:

Hearsay statements of co-conspirators may be admitted against one another whenever the existence of the conspiracy is established by independent evidence. *Mares v. United States*, 383 F.2d 805 (10th Cir. 1967), cert. denied 394 U.S. 963, 89 S.Ct. 1314, 22 L.Ed.2d 564 (1969). Under *Mares*, such statements must be made during the conspiracy in order to be admissible. We followed and expanded this general rule in *United States v. Coppola*, 479 F.2d 1153 (10th Cir. 1973), wherein we noted that statements of co-conspirators made during the "continuation" of the conspiracy are admissible. See also *Green v. United States*, 386 F.2d 953 (10th Cir. 1967). Such statements must, of course, be made in "furtherance" of the conspiracy. *Grunewald v. United States*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957); *Krulewitch v. United States*, 336 U.S. 440. 69 S.Ct. 716, 93 L.Ed. 790 (1949); *United States v. Coppola, supra.*

496 F.2d, at p. 296.

See also: *United States v. Jones*, 540 F.2d 465 (10th Cir. 1976), *cert. denied*, 429 U.S. 1101, 97 S.Ct. 1125, 51 L.Ed.2d 551 (1977); *United States v. Kramer*, 521 F.2d 1073 (10th Cir. 1975), *cert. denied*, 424 U.S. 909, 96 S.Ct. 1104, 47 L.Ed.2d 313 (1976). Under the circumstances presented herein the admission of Espinosa's conversation with Apodaca was not erroneous.

## II.

Montgomery contends that after the trial court had allowed Espinosa to testify relative to his conversation with Apodaca, the court should have allowed Montgomery to introduce the aforesaid exculpatory letter written by Apodaca to him dated August 7, 1976. Montgomery argues that the trial court had "an overwhelming responsibility in the interest of fundamental fairness" to allow the introduction of the letter. As noted, *supra*, the letter was not admitted by the trial court both because it is hearsay and because it was written long after the conspiracy had terminated, the latter ground constituting the basis of the Government's specific objection thereto in compliance with the "specific" ground requirement of Fed.R.Evid. Rule 103(a)(1), 28 U.S.C.A. Following the *in camera* offer of proof made by Montgomery in relation to the admission in evidence of the Apodaca letter, counsel for Montgomery argued that the letter met the exception to the hearsay rule because ". . . it's just like the testimony of the government, it is hearsay but it is co-conspirator's statement." [R., Vol. IV, p. 389.]

Although the letter proper was not included in the record on appeal, we hold that the trial court did not err in denying its admission in evidence. We deem it significant to note that Herrera testified that he and Apodaca told Montgomery that the Peterbilt belonged to Apodaca's late father, clearly indicating that Montgomery was not aware that the truck was stolen. The letter, *apparently*, was an apology from Apodaca to Montgomery, in which Apodaca stated that he "felt bad about telling Bernard [Montgomery] a lie about the truck" since "[h]e might get him into trouble when he told him something that didn't really happen."

The Apodaca letter to Montgomery was offered in evidence without limitation. Thus, it could only have been offered to prove the truth of the matter asserted. It was clearly hearsay. Accordingly, it necessarily must have met the exceptions set forth in Fed.R.Evid.Rule 801(d)(1) or (2), 28 U.S.C.A. It did not. Montgomery's counsel, at the time of his motion for admission of the letter, insisted on its admissibility inasmuch as ". . . it's just like the testimony of the government [i. e., Espinosa's testimony of statements made by Apodaca in his presence] it is hearsay but it is co-conspirator's statement." The motion was not well taken. The Espinosa testimony relative to remarks made by Apodaca was admissible because the remarks were made by ". . . a co-conspirator of a party during the course and in furtherance of the conspiracy." Rule 801(d)(2)(E), *supra*. Beyond question, the letter from Apodaca to Montgomery *was not* written ". . . during the course and in furtherance of the conspiracy." It could not have met the "four corners" of Rule 801, *supra*. In *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) the Supreme Court said:

It is settled that in federal conspiracy trials the hearsay exception that allows evidence of an out-of-court statement of one conspirator to be admitted against his fellow conspirators applies only if the statement was made in the course of and in furtherance of the conspiracy, and not during a subsequent period when the conspirators were engaged in nothing more than concealment of the criminal enterprise. *Lutwak v. United States*, 344 U.S. 604, [73 S.Ct. 481, 97 L.Ed. 593]; *Krulewitch v. United States*, 336 U.S. 440, [69 S.Ct. 716, 93 L.Ed. 790]. The hearsay exception that Georgia applied in the present case, on the other hand, permits the introduction of evidence of such out-of-court statement even though made

during the concealment phase of the conspiracy.

400 U.S., at p. 81, 91 S.Ct. at 216.

*Dutton, supra,* shows that the co-conspirator exception is alive and well after *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) in federal conspiracy trials. In *Bruton,* Evans and Bruton were convicted by a jury in a joint trial for armed postal robbery. A postal inspector testified that after Evans was arrested, he (Evans) orally confessed that he and Bruton committed the robbery. Evans did not testify at the trial. The trial court instructed the jury that it was not to consider Evans' confession against Bruton because it was hearsay. The Supreme Court, in reversing, held that the risk that the jury may have relied upon the extrajudicial incriminating statements made by Evans was so great that, despite the trial court's instruction to disregard them, Bruton's right of cross-examination secured by the confrontation clause of the Sixth Amendment was violated. The statement made by Evans in *Bruton* which the Supreme Court held *should not* have gone before the jury was a *past crime* confession. It was not made during the *actual* commission of the crime. Thus, there is nothing in *Bruton, supra,* or *Dutton, supra,* indicating that the Supreme Court has retreated from or is inclined to upset the doctrine of the co-conspirator exception to the hearsay rule in federal prosecutions, i. e., that the act or declaration by one co-conspirator committed in furtherance of the conspiracy made during its pendency is admissible against each and every co-conspirator provided that a foundation for its reception is established by independent proof of the existence of conspiracy. *McGregor v. United States,* 422 F.2d 925 (5th Cir. 1970); *United States v. Littman,* 421 F.2d 981 (2d Cir. 1970), *cert. denied,* 400 U.S. 991, 91 S.Ct. 448, 27 L.Ed.2d 438 (1971).

█ It is well settled that if an appellant fails to alert the trial court of claimed error, the issue cannot be raised for the first time on appeal unless "plain error" is held to apply. *United States v. Guerrero,* 517 F.2d 528 (10th Cir. 1975); *United States v. Ray,* 488 F.2d 15 (10th Cir. 1973); *Fitts v. United States,* 376 F.2d 516 (10th Cir. 1967); Fed.R.Crim.P. Rule 52(b), 18 U.S.C.A. We repeat that here Montgomery's counsel moved for the admission of the Apodaca letter on the ground that ". . . it's just like the testimony of the government . . . it is co-conspirator's statement." The ground relied upon missed the mark. The trial court did not err in denying its admission. The admissibility of evidence is discretionary with the trial court and will not be disturbed on appeal unless clearly erroneous. *United States v. Brumley,* 466 F.2d 911 (10th Cir. 1972), *cert. denied,* 412 U.S. 929, 93 S.Ct. 2755, 37 L.Ed.2d 156 (1973); *United States v. Acree,* 466 F.2d 1114 (10th Cir. 1972), *cert. denied,* 410 U.S. 913, 93 S.Ct. 962, 35 L.Ed.2d 278 (1973).

█ Finally, it is clear that in determining whether the "plain error" rule should be invoked, the appellate court must consider the whole record. *United States v. Walton,* 552 F.2d 1354 (10th Cir. 1977), *cert. denied,* 431 U.S. 959, 97 S.Ct. 2685, 53 L.Ed.2d 277 (1977); *Adams v. United States,* 375 F.2d 635 (10th Cir. 1967), *cert. denied,* 389 U.S. 880, 88 S.Ct. 117, 19 L.Ed.2d 178 (1967). The record demonstrates, beyond dispute, that the matters contained in the Apodaca letter to Montgomery were *already* before the jury. These very matters were testified to by Herrera in the course of his direct examination. That being so, the contents of the letter were cumulative of evidence *already* presented in defense for consideration by the jury. Thus, the record discloses that the Apodaca letter to Montgomery was inadmissible. The substantial rights of Montgomery were not prejudiced. If any error occurred in this regard, it was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

WE AFFIRM.

HOLLOWAY, Circuit Judge, concurring in the result:

I agree with the view of Judge Barrett in Part I of our principal opinion that under

Rule 801(d)(2)(E) the trial court properly admitted the challenged testimony of Officer Espinosa relating the conversation with Mr. Apodaca, the same being within the provision that a statement by a coconspirator of a party, made during the course and in furtherance of the conspiracy, is not hearsay. Further I agree with Judge Barrett's view in Part II that the letter from Apodaca to Montgomery was not admissible under that same provision of Rule 801(d)(2)(E). All of the limitations on the definition of hearsay in Rule 801(d)(2) deal with cases where "[t]he statement is offered *against* a party . . ." (Emphasis added). Since the letter was being offered by defendant Montgomery, and also because it was not written during the course and in furtherance of the conspiracy, Rule 801(d)(2)(E) does not support the admission of the letter.

However, I am unable to agree with Judge Barrett's view (at 518) that since the letter was hearsay, it necessarily had to meet the requirements of Rule 801(d)(1) or (2) to be admissible, which it failed to do.

A coconspirator's statement is not admissible only under those limited provisions. I feel that a substantial argument could be made for the admission of the letter under the hearsay exception of Rule 804(b)(3), as a statement against interest, when offered by defendant Montgomery.[1] The letter was a statement against Apodaca's penal interest, as the dissent of Judge McKay points out. (Dissenting opinion at 523). The Government conceded at trial that the letter in part purports to exonerate Montgomery, but objected to it on hearsay grounds, its authenticity not being challenged however. (IV R. 322). And it should be noted that the Government also conceded that following an examination of the letter it had a report which was inconclusive as to the handwriting but was conclusive that Apodaca's fingerprints appear on the letter. (IV R. 323).

However, neither the theory of the exception for statements against interest nor Rule 804(b)(3) itself were argued to the trial court as a basis for admission of the letter.[2] After the objections and the rul-

1. For such an exculpatory statement to be admissible under Rule 804(b)(3), the trial court should determine whether the statement is one against interest and whether corroborating circumstances clearly indicate the trustworthiness of the statement. See *United States v. Barrett,* 539 F.2d 244, 251 (1st Cir.)

   The exception of Rule 804(b)(3) may be invoked for admission of a coconspirator's statement which meets the requirements of that rule. See, *e. g., United States v. Barrett,* supra, 539 F.2d at 246, 249–53. If Rule 801(d)(2) were the sole ground for admission of a statement of a coconspirator, then admission would be limited to a statement "offered against a party"—a result which the Rules do not seem to intend.

2. The letter was first offered during Espinosa's cross-examination and Montgomery's counsel then argued that if the oral statements of Apodaca were coming in against Montgomery without benefit of cross-examination, Apodaca's other statements in the "notarized letter" should be admitted. Montgomery's counsel stated also that the court had ruled that coconspirator's statements made outside the presence of the defendant are admissible, that the defendant "would extend that just a bit," that the letter was "likewise admissible," and that if the government had any legitimate contention that the letter was not one from Apodaca to Montgomery there might be an arguable question, but that he did not think the government

made any such contention. (IV R. 324). Throughout the government argued only the hearsay objection.

   Defense counsel contended that what was "good for the goose is good for the gander, but [the letter] is more reliable than hearsay." (*Id.* at 325). The court said the letter was a communication between one conspirator and the other and that it is admissible against the conspirators, but not in favor of them. (*Id.* at 324–25).

   Later, while the jury was excused for an offer of proof and Herrera was being questioned by Montgomery's counsel, the letter was again offered after Herrera testified about statements made by Apodaca that he "felt bad about telling Bernard a lie about the truck. He might get him into trouble when he told him something that didn't really happen." (*Id.* at 387–88). Herrera testified that Apodaca said Montgomery wasn't aware the truck was stolen, and that information indicating that Montgomery did not know the Peterbilt truck was stolen was contained in the letter. (*Id.* at 388–89). Defendant offered the letter after Herrera's testimony discussing it, saying that ". . . the letter now has foundation for introduction and it's just like the testimony of the government, it is hearsay but it is co-conspirator's statement." (IV R. 389; see also IV R. 324). The trial judge then stated that he would deny admission of

ings rejecting the letter, Montgomery's counsel proceeded with no mention of the statement against interest exception. Since this exception of Rule 804(b)(3) was not brought to the attention of the trial court, we should not now find error on the basis that the court failed to make the required determinations and failed to admit the letter under that Rule. See *United States v. Wells,* 525 F.2d 974, 976 (5th Cir.); *In re Estate of Poulos,* 229 N.W.2d 721, 726 (Iowa); *Arizona Water Co. v. City of Yuma,* 7 Ariz.App. 53, 436 P.2d 147, 151; *Johnson v. Rockaway Bus Corp.,* 145 Conn. 204, 140 A.2d 708, 710; and see *Chambers v. Mississippi,* 410 U.S. 284, 304, 93 S.Ct. 1038, 35 L.Ed.2d 297 (White, J., concurring).

The dissent concludes there was error under the principles of *Chambers.* I cannot agree, for to me the holding in *Chambers* was based on the totality of the circumstances which resulted, *inter alia,* in some confessions which exculpated Chambers being excluded. See 410 U.S. at 298, 93 S.Ct. 1038. Here, as Judge Barrett points out, testimony by Herrera put before the jury Apodaca's statements to Montgomery that the Peterbilt truck belonged to his relatives (IV R. 391, 396–97), and the letter's statements such as that Apodaca had "told Montgomery that [his] father died and left me two big trucks . . ." and that "Montgomery I am sorry I lied to you about that big truck I had you sill (sic) to Louie . . ." (Supp.R. at 5–6), seem to concern the same point.[3] Thus the ultimate impact was not as serious as the rulings in *Chambers* and, to me, does not amount to a denial of due process under *Chambers* principles.

Montgomery's counsel at trial and on appeal argued for admission of the letter on fairness grounds, *i. e.,* that if the incriminating statements of Apodaca were admitted, the exculpatory letter should also come in. I would agree that for what it is worth, the fairness theory was raised properly. Nevertheless there seems to be no basis for admitting the letter on such a ground. And as already noted, the theory that the letter was admissible as a coconspirator's statement is untenable and the statement against interest exception was not presented at trial.

In sum, I am convinced there was no reversible error and, accordingly, concur in the result reached by Judge Barrett.

McKAY, Circuit Judge, dissenting as follows:

The trial court permitted a government agent to testify concerning an out of court oral statement of an absent and unavailable alleged coconspirator which was inculpatory of appellant. When appellant attempted to introduce a written statement of the same declarant, which contradicted the oral statement, the court refused admission on the ground that appellant's proffered evidence did not fall within the technical confines of the conspiracy exception to the hearsay rule. The written statement bore on the only substantial issue in the case—whether appellant had guilty knowledge.

Here again we are confronted with the government's use of the sweeping and relatively undisciplined law of conspiracy to expand its own powers at the expense of constitutional and evidentiary proscriptions. The Supreme Court repeatedly has condemned these expansions.[1] What pushes

---

the letter on two grounds, one that it is hearsay and the other that the letter came long after the conspiracy, if any, had expired. (*Id.* at 389).

**3.** As noted Apodaca's letter does say that he had told Montgomery his "father died and left me two big trucks." (Supp.R. at 5). The second "truck" would not seem to refer to the D–3 Caterpillar, however, and thus the letter appears to exculpate Montgomery only as to knowledge that the Peterbilt truck was stolen. Herrera's testimony covered that point.

**1.** "Prior cases in this Court have repeatedly warned that we will view with disfavor attempts to broaden the already pervasive and wide-sweeping nets of conspiracy prosecutions." *Grunewald v. United States,* 353 U.S. 391, 404, 77 S.Ct. 963, 974, 1 L.Ed.2d 931 (1957); *see Dutton v. Evans,* 400 U.S. 74, 83, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); *Krulewitch v. United States,* 336 U.S. 440, 443–44, 69 S.Ct. 716, 93 L.Ed. 790 (1949); *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

this case beyond the pale of even our prior relaxed standards of admissibility in conspiracy cases is not that the government's admitted evidence did not qualify under the conspiracy exception, but that the trial court, at the government's insistence, cut off appellant's attempt to confront the absent witness against him with such material as was available under the circumstances—another hearsay and contradicting statement of the truant witness.

At risk here is the further erosion of a criminal defendant's Fifth and Sixth Amendment rights to "due process," "to be confronted with the witnesses against him," and to present "witnesses in his favor." The one-way resort to long-standing exceptions to the hearsay rules to justify circumvention of direct confrontation while at the same time applying technical hearsay rules to prevent the nearest substitute for cross-examination—presentation of a contradicting statement—does violence both to the general concept of due process and its more specific elements, confrontation and the right to present witnesses in one's favor. Whatever can be said about the admission of the hearsay report of the inculpatory statement in this case, it cannot be said by any stretch of the imagination that rejecting the absent declarant's exculpatory statement satisfies the pure concept of "confrontation" or its derivative notion of "cross-examination."[2] In addition, this one-way process permitted the government to have the benefit of the absent "witness in [its] favor" while denying the defendant the same opportunity as to the same witness.

The combination of these denials constitutes a clear breach of the standard of due process and fair trial articulated in *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973): "[W]here constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied

mechanistically to defeat the ends of justice." In *Chambers*, the Supreme Court reversed a conviction because the defendant was precluded by state evidentiary rules from introducing hearsay confessions of a witness and from impeaching that witness. The witness had previously confessed to the crime for which the defendant was charged but later denied in court that he committed the crime. The Court held that this mechanistic application of the voucher and hearsay rules deprived the defendant of a fair trial. The Court recognized that the right to confront may not be absolute but declared that "its denial or significant diminution calls into question the ultimate 'integrity of the fact-finding process' and requires that the competing interest be closely examined." *Id.* at 295, 93 S.Ct. at 1046 (quoting *Berger v. California*, 393 U.S. 314, 315, 89 S.Ct. 540, 21 L.Ed.2d 508 (1969)). The "interest" requiring close examination in this case is the hearsay rule's foundational policy of precluding the admission of unreliable evidence in the "fact-finding process."

Both the confrontation clause and the hearsay rule are based on the above policy. *Dutton v. Evans*, 400 U.S. at 86, 88, 91 S.Ct. 210. The conspiracy exception, like other hearsay exceptions, exists because evidence covered by the exception is believed to be sufficiently reliable to assist the trier of fact. Proof of admissibility under an exception, however, is not sufficient to show compliance with the confrontation clause. The Supreme Court has declared:

> While it may readily be conceded that hearsay rules and the Confrontation Clause are generally designed to protect similar values, it is quite a different thing to suggest that the overlap is complete and that the Confrontation Clause is nothing more or less than a codification of the rules of hearsay and their exceptions as they existed historically at com-

---

**2.** Cross-examination has long been held to be a cornerstone of confrontation. "[A] major reason underlying the constitutional confrontation rule is to give a defendant charged with crime an opportunity to cross-examine the witnesses

against him." *Pointer v. Texas*, 380 U.S. 400, 406–07, 85 S.Ct. 1065, 1069, 13 L.Ed.2d 923 (1965); *see Bruton v. United States*, 391 U.S. 123, 126, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

mon law. Our decisions have never established such a congruence; indeed, we have more than once found a violation of confrontation values even though the statements in issue were admitted under an arguably recognized hearsay exception.
*California v. Green*, 399 U.S. 149, 155–56, 90 S.Ct. 1930, 1934, 26 L.Ed.2d 489 (1970); *see Dutton v. Evans*, 400 U.S. at 81–82, 91 S.Ct. 210. Compliance with the confrontation clause must be tested on a case by case basis by examining all the circumstances to determine whether "the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement." *California v. Green*, 399 U.S. at 161, 90 S.Ct. at 1936; *see Dutton v. Evans*, 400 U.S. at 89, 91 S.Ct. 210; *United States v. King*, 552 F.2d 833, 845 (9th Cir. 1976), *cert. denied*, 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977); *United States v. Rogers*, 549 F.2d 490, 500 (8th Cir.), *cert. denied*, 431 U.S. 918, 97 S.Ct. 2182, 53 L.Ed.2d 299 (1976).

Through application of the conspiracy exception, the government admitted an inculpatory statement of a witness who was unavailable for direct confrontation. To insure the best possible protection of confrontation rights, all available bases for evaluating a witness' truthfulness should be provided to the jury. Certainly, "a satisfactory basis for evaluating the truth" cannot refer only to positive indications of credibility. While there was some direct evidence in this case bearing on the inculpatory statement's reliability, by exclusion of the letter the jury was deprived of significant assistance in weighing the believability of the absent witness. Even if the conspiracy exception on its face might be found not to violate the Sixth Amendment, the mechanistic application of the hearsay rules to bar what little confrontation as was here available cannot be permitted. In fairness to a defendant who is subjected to hearsay accusations admitted by a questionable skirting of the confrontation clause, statements from the accusing declarant ought to be admissible to enable the jury more adequately to judge the credibility of the original statement.

Additionally, there were numerous indicia of the exculpatory statement's reliability. It was clearly against the declarant's penal interest as it established his guilty knowledge that the vehicle was stolen. The corroborating circumstances arguably established the statement's trustworthiness sufficiently to find it admissible as a statement against interest under Rule 804(b)(3) of the Federal Rules of Evidence. It is unlikely that the declarant would seek to establish an untrue record of appellant's innocence by penning an admission of his own guilt, particularly when he had not been caught and was not even charged. The letter predated the indictment and arrest warrant by nearly a month. Record, vol. 4, at 387. Further, there is no risk here of a tale bearer inaccurately or untruthfully presenting the hearsay to the jury since the original document was available. Even if these indicia of credibility were insufficient to qualify the hearsay letter for admission under Rule 804(b)(3), its exclusion when coupled with the prior statement's admission is clearly repugnant to the Constitution.

The only case on point disclosed by independent research is *United States v. Benveniste*, 564 F.2d 335 (9th Cir. 1977). In that conspiracy case the Ninth Circuit reversed a conviction because the trial court admitted an inculpatory, extrajudicial statement but rejected exculpatory hearsay statements of the same witness after she refused to take the stand. Applying the *Chambers* approach, the court found that the excluded statements arguably fell within the statement against interest exception to the hearsay rule. The court concluded "that the rejection of the exculpatory hearsay was in error, particularly in view of the fact that accusatory hearsay was admitted." 564 F.2d at 342. I agree with the *Benveniste* decision.

I do not argue here for expansion of the general hearsay exceptions. What concerns me is the trial court's duty to protect appellant's right to confront and to present witnesses once the government is permitted to breach the hearsay wall. Due process can-

not stand idly by while the government, having first opened the evidentiary door, then seeks through a "mechanistically" applied hearsay rule to close the door to what is left of the opportunity for appellant to confront the witness[3] against him or to present the same witness in his favor.

If trial courts are to continue the use of hearsay statements at the behest of the government they must begin to develop solid rules to minimize the recognized offense to the Fifth and Sixth Amendments as mandated by *Chambers*. This would be a good case in which to begin. I would reverse and remand for a new trial.

**3.** It should go without saying that the principal witness in question under the Sixth Amendment is the one the government relies on to prove a substantive fact, not the reporting witness who says what the first witness witnessed. Otherwise, as all admit it cannot be, the government could establish rules permitting entire trials based on affidavits qualified for admission by live notaries even though "the paradigmatic evil the Confrontation Clause was aimed at [was] trial by affidavit." *Dutton v. Evans*, 400 U.S. at 94, 91 S.Ct. 222 (Harlan, J., concurring). This does not derogate the rule that appellant is also entitled to confront the witness who reports the hearsay on the stand.